PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4295
_____


In Re:  AMERICAN HOME MORTGAGE HOLDINGS,
INC., et al;

Debtors


*CRÉDIT AGRICOLE CORPORATE AND
INVESTMENT BANK NEW YORK BRANCH,
f/k/a Calyon New York Branch,

Appellant

v.

AMERICAN HOME MORTGAGE HOLDINGS, INC.,
ET AL

*(Pursuant to Clerk's Order dated 3/18/2010)


_____


On Appeal from the United States Bankruptcy Court
for the District of Delaware
(D.C. No. 1-07-bk-11047)
District Judge:  Honorable Christopher S. Sontchi

_____


Argued November 15, 2010

Before:  McKEE, *Chief Judge*, SLOVITER, and
RENDELL, *Circuit Judges*

(Filed  February 16, 2011)

_____

Benjamin Ackerly   (Argued)
Jason W. Harbour
Hunton & Williams
Richmond, VA  23219

Michael Busenkell
Womble, Carlyle, Sandridge & Rice
Wilmington, DE  19801

      Attorneys for Appellant

Michele S. Budicak
Curtis J. Crowther
John T. Dorsey  (Argued)
Young, Conaway, Stargatt  & Taylor
Wilmington, DE  19899

      Attorneys for Appellees


_____

OPINION OF THE COURT
_____

SLOVITER, *Circuit Judge*.

If we can avoid preoccupation with the dazzling number of monetary digits involved in this case (the contractual repo price of almost $1.2 billion, the Purchaser's claim totaling in excess of $478 million, and the parties' damages calculations that are nearly $500 million apart), the issue before us is limited to a determination of the meaning of the statutory phrase requiring damages to be measured based on a "commercially reasonable determinant[ ] of value."  It is an issue of statutory construction such as those routinely faced by federal courts, although it appears to be an issue of first impression.

2

# I.

## Factual and Procedural History

Appellees American Home Mortgage Holdings, Inc., American Home Mortgage Investment Corp., American Home Mortgage Acceptance, Inc., AHM SV, Inc.,[1] and American Home Mortgage Corp. (collectively, "Debtor"), and Appellant Calyon New York Branch ("Calyon"),[2] as Administrative Agent (the "Purchasers"), are parties to a Repurchase Agreement (the "Repurchase Agreement"), dated November 21, 2006, covering a portfolio of home mortgages.

A repurchase agreement, often referred to as a "repo agreement," is defined in § 101(47) of the Bankruptcy Code as "an agreement, including related terms," that (1) "provides for the transfer of one or more . . . mortgage loans, [or] interests in mortgage related securities or mortgage loans[;]" (2) "against the transfer of funds by the transferee of such . . . mortgage loans, or interests[;]" (3) "with a simultaneous agreement by such transferee to transfer to the transferor thereof . . . mortgage loans, or interests [in mortgage related securities or mortgage loans;]" (4) "at a date certain not later than 1 year after such transfer or on demand[;]" (5) "against the transfer of funds[.]"  In simple words, the purchaser of an asset promises to sell it back at the time fixed or when asked. Repurchase Agreements are among the transactions governed by § 562 of the Bankruptcy Code which was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, § 910, 119 Stat. 23, 184 (2005), described by Congress as "a

---

[1] AHM SV, Inc. was previously American Home Mortgage Servicing, Inc., and changed its name during the course of the bankruptcy proceedings as a result of the sale of the servicing business.

[2] As of February 7, 2010, Calyon became Crédit Agricole Corporate and Investment Bank, New York Branch.

3

comprehensive package of reform measures pertaining to both consumer and business bankruptcy cases." H.R. Rep. No. 109-31, at 2 (2005).

Pursuant to the 2006 Repurchase Agreement, Calyon purchased approximately 5,700 mortgage loans with an original unpaid principal balance of just under $1.2 billion. The mortgage properties were located in all fifty states of the United States. The portfolio was principally comprised of adjustable rate mortgages and pay option adjustable rate mortgages, as well as a small portion of Government conforming loans and second lien loans.

Sometime before August 1, 2007, the Debtor defaulted on some of its obligations under the Repurchase Agreement. Calyon served the Debtor with a notice of default and accelerated the Repurchase Agreement on August 1, 2007 (the "Acceleration Date"). Section 562 of the Bankruptcy Code covers the timing for measurement of damages in the event of acceleration. Because of the acceleration of the Agreement, the Debtor became obligated to repurchase the mortgage loans at the Repurchase Price which, on the Acceleration Date, was $1,143,840,204.36. The Debtor filed its voluntary petition for Chapter 11 relief under the Bankruptcy Code on August 6, 2007, and the case was assigned to Christopher S. Sontchi, a Bankruptcy Judge from the District of Delaware.

Calyon filed four identical proofs of claim against four different debtors for an amount that exceeded the total Repurchase Price. One year later, the Debtor filed its objections to the claims, seeking either to disallow them or reduce them pursuant to § 562 of the Bankruptcy Code.[3]

---

[3] In the interim, Calyon sought a declaratory judgment that its agreement with the Debtor was a "repurchase agreement" within the meaning of § 101(47) of the Bankruptcy Code. The Bankruptcy Court agreed, and held that Calyon's rights with respect to the Loan Portfolio were exempted from the automatic stay of 11 U.S.C. § 362(a), and

Section 562, which addresses the timing for the measurement of damages in connection with repurchase and other agreements, provides in relevant part:

> (a) [I]f a . . . repo participant . . . liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of --
>
> > (1) the date of such rejection; or
>
> > (2) the date or dates of such liquidation, termination, or acceleration.
>
> (b) If there are not any **commercially reasonable determinants of value** as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are **commercially reasonable determinants of value**.

11 U.S.C. § 562 (emphasis added).

The parties stipulated to four possible valuation dates of the Loan Portfolio: August 1, 2007 (the Acceleration Date), September 30, 2007 (before the Debtor sold another large Loan Portfolio), January 30, 2008 (after the Bankruptcy Court's decision in *In re Am. Home Mortg., Inc.*, 379 B.R. 503 (Bankr. D. Del. 2008), declaring that the agreement constituted a repurchase agreement within the meaning of the Code), and August 15, 2008 (the earliest date that Calyon claimed it could obtain a reasonable market or sale price for the Loan Portfolio).

The Repurchase Price on September 30, 2007 remained $1,143,840,204.36, the same as that on the

were not avoided or otherwise limited by any provision of the Code. *In re Am. Home Mortg., Inc.*, 379 B.R. 503, 518-520 (Bankr. D. Del. 2008). The Debtor does not challenge this holding.

5

Acceleration Date. By January 30, 2008, Calyon had received payments on the mortgage loans, reducing the Repurchase Price to $1,070,933,296.54. As of August 15, 2008, the Repurchase Price had been further reduced to $994,416,230.32. Although the parties agreed on the stipulated dates, they vigorously disagree as to the methodology for the measurement of damages, and consequently to the amount of damages.

In objecting to Calyon's claims, the Debtor argued that a "commercially reasonable determinant of value," namely the Discounted Cash Flow ("DCF") method, existed on the Acceleration Date and that § 562(a) accordingly fixed the measurement of Calyon's damages as of that date. The Debtor claimed that using that valuation methodology, the value of the Loan Portfolio exceeded the Repurchase Price and that therefore Calyon lacked a deficiency claim as of the Acceleration Date.

Not surprisingly, Calyon contested this interpretation, arguing that the only appropriate valuation methodology under § 562 is the market or sale value of the Loan Portfolio, and that because the mortgage market was dysfunctional on the Acceleration Date, there were no "commercially reasonable determinants of value" as of that date. Calyon asserted that, pursuant to § 562(b), the earliest possible date that market or sale value could be determined was August 15, 2008, and that as of that date the market or sale value of the Loan Portfolio was less than the Repurchase Price and resulted in a deficiency claim of $478,493,165.28 when the Loan Portfolio was valued on a servicing retained basis. As the Bankruptcy Court had previously explained:

> Mortgage loans can be bought and sold on either a "servicing retained" or a "servicing released" basis. In a servicing retained sale of a mortgage loan, the seller of the loan retains the right to designate the mortgage loan servicer.

6

379 B.R. at 510.[4]  The Court stated that the mortgage loans were sold to the Purchasers on a servicing retained basis, and because the Debtor designated AHM SV, Inc., as the servicer, it was entitled to a monthly servicing fee.

The Bankruptcy Court held a two-day evidentiary hearing on the Debtor's objections.  The Bankruptcy Court recognized that if the Debtor was correct that the value of the Loan Portfolio on the Acceleration Date exceeded the Repurchase Price on that date, Calyon would not have any deficiency or damage claim.  Thus, the Court proceeded to determine the value of the assets subject to the Repo Agreement, i.e., the Loan Portfolio.

During the hearing, the Court heard testimony from the Debtor's expert, Dr. Ronnie Clayton,[5] who explained that the

_____

[4] The Repurchase Agreement spells out the duties of the servicer, which include responsibility for collecting the monthly mortgage payments of principal and interest, monitoring past-due accounts and reporting on defaulted loans.  In response to Calyon's subsequent objection to this arrangement, on August 8, 2008 the Bankruptcy Court approved the stipulation dated July 21, 2008, authorizing transfer of the Service Mortgage Servicing Rights to Calyon for all purposes.

[5] Dr. Clayton holds the Glenn Huie Eminent Scholar Chair at Jacksonville State University in Jacksonville, Alabama.  He received his Ph.D. in finance, with minors in real estate, economics, and econometrics, from the University of Georgia in 1982.  As a visiting scholar at the Federal Home Loan Bank Board's Office of Policy and Economic Research, he developed a model of mortgage cash flows to assist the valuation of savings and loans assets.  After he left as a scholar, Dr. Clayton's work consisted of analyzing the risk associated with collateralized mortgage obligations, examining the cash flows of a mortgage portfolio, and assessing the appropriateness of bank activities in the sub-prime mortgage market.  He has published articles dealing

Discounted Cash Flow analysis values the asset's cash flow. There was evidence that the cash stream from the Loan Portfolio, i.e., principal and interest that the loans generated, was approximately $275 million as of the date of the hearing on May 19, 2009.[6] To determine the DCF value of the entire Loan Portfolio, Dr. Clayton determined the DCF value of each individual mortgage. He adjusted the interest rate on each mortgage to reflect market conditions, as described in the Federal Home Loan Mortgage Corporation's Primary Mortgage Market Survey, conducted by Freddie Mac. He also took into account actual delinquency rates on the mortgage loans as of the particular valuation date.[7] Dr.

---

with mortgage interest rates and the relationship of those mortgage interest rates to other interest rates in the market, and other articles addressing the performance of saving associations. The Court found Dr. Clayton to be an expert in the area of finance and specifically in the area of valuations of assets that generate cash flows.

[6] At oral argument, counsel for the Debtor calculated that as 20% of the asset value as of August, 2008, and stated that it reached 25% as of the date of the hearing.

[7] Dr. Clayton's valuation did not take into account the subsequent deterioration of credit performance and increase in delinquency rates. With regard to how the actual delinquency rates factored into the DCF methodology, Dr. Clayton testified as follows:

Q:    Did you utilize the actual delinquency information from the mortgage data?

A:    I did. And then we would then take the present value of those, as interest rates fluctuated, you would adjust those.

Q:    How did you determine the recovery at 50% under the line item for that?

A:    When a mortgage becomes delinquent, at that

Clayton's relevant testimony is set forth in the margin. He then applied the adjusted rates to discounted cash flows on each mortgage as of each of the four stipulated dates, the sum of which resulted in the valuation of the Loan Portfolio as of each of those dates. Dr. Clayton testified that using this valuation method, the value of the Loan Portfolio on each of the stipulated dates exceeded the applicable Repurchase Price, leading the Bankruptcy Court to conclude that Calyon suffered no damage during the relevant period. Calyon did not, and does not now, attack the methodology Dr. Clayton used to calculate the DCF but only attacks DCF as a recognizable commercially reasonable determinant of value.

Dr. Clayton also testified that he did not deviate in any way from the accepted methodology to conduct a DCF valuation of each mortgage. He explained that "[u]nless there is something very, very strange going on in the market, the market value of the assets and the discounted cash flow value of the assets will be very, very similar . . . ." App. at 540. All of the experts (and the parties) agreed that the secondary mortgage market was dysfunctional on August 1, 2007 (the Acceleration Date). Dr. Clayton noted that even in a dysfunctional market his valuation of the Loan Portfolio would be the same because the assets "are held for the cash flow, not for the distress sale in the market." App. at 550.

---

point, you know, we know we got -- we have an issue. And you may recover everything from a delinquency, or you may recover nothing. And, you know, it depends upon the efforts that you put forth, and a variety of other things.

But, if you take the average of zero recovery and a 100% recovery, if -- you know, assuming in that case, the property was probably sold to recover -- for enough to recover everything, then the average between those two numbers is 50%. And so I -- that's what I utilized.

App. at 546.

The premise underlying the acceptance of the DCF methodology for the case is that the Loan Portfolio held by Calyon was held, and not sold, at that time. Calyon's counsel stated at oral argument that Calyon had the option to retain the Loan Portfolio. Admittedly, Calyon did not purchase the Loan Portfolio to have an income stream. Its intent was to resell the Portfolio within the year. However, the Repurchase Agreement gave Calyon the right to retain the Loan Portfolio, and it chose that option in light of the distressed market. Both counsel for the Debtor and for Calyon agreed that a sale on or about the Acceleration Date would not have been "commercially reasonable."

The Court also heard testimony from Calyon's witnesses; its managing director, John-Charles van Essche,[8] and its expert, Robert Branthover.[9] Van Essche testified that

---

[8] Van Essche worked in Calyon's workout and distressed asset department. That department handled "the distressed and workout situations at the bank, either loans or investments that have gone bad." App. at 586. His group was charged with managing those assets in order "to maximize recoveries and/or minimize losses." *Id.* His group was also charged with managing the Repurchase Agreement. Van Essche stated that, with respect to the Repurchase Agreement: "I'm the point person for all matters concerning this transaction. I'm the one who deals with the debtor where there needs to be an interaction with the debtor and the case here, this particular situation where there's litigation. I'm the one that's involved in running that with attorneys . . . . I basically run this transaction, manage it for the group at large." App. at 587-88.

[9] Branthover is the Senior Vice President in charge of the Secondary Solutions Group at Mortgage Industry Advisory Corporation ("MIAC"). He was retained by Calyon to testify regarding the market value of the mortgages in the Loan Portfolio, i.e., to determine the fair value that those loans could be sold for in the marketplace. Branthover graduated with a B.S. in finance from the University of

10

there were issues with the Loan Portfolio that affected its salability on the Acceleration Date. He explained that, among other things, there was a dispute as to the ownership of the Loan Portfolio, there were issues regarding servicing, and Calyon lacked complete records on the mortgage loans.[10] According to him, "all those elements put together made it extremely difficult, if not impossible, for [Calyon] to sell these loans at anything close to a reasonable price, assuming there was a market there in the first place." App. at 607.

Branthover similarly testified to the issues affecting the salability of the Loan Portfolio, and opined that the value of the Loan Portfolio as of the Acceleration Date was "extremely

_____

Maryland. He had worked in the financial services industry for twenty years, and in the most recent ten he had been involved, almost exclusively, with the mortgage industry, valuing mortgage product, pricing from an origination, hedging from a distribution perspective, and selling that collateral under the secondary market. Branthover explained that MIAC writes software that permits institutions to manage their mortgage portfolios to value mortgage collateral, hedges advisory services and works with mortgage companies to allow MIAC or the companies to price, hedge and sell their mortgages into the secondary market, does consulting work, and also does valuation work. The Court found that Branthover was an expert on the subject of mortgage valuation.

[10] The parties stipulated in the Bankruptcy Court to the following facts: (1) the Debtor initially asserted that it was the legal owner of the mortgage loans and its proceeds; (2) the Bankruptcy Court held that as of January 30, 2008, Calyon owned the mortgage loans; (3) Calyon did not receive, and the Debtor did not send to Calyon, the proceeds from the mortgage loans until after the entry of a stipulation on January 25, 2008; and (4) as of January 30, 2008, Calyon did not have complete and accurate copies of the mortgage files related to the mortgage loans.

11

low," ascribing it a value of ten cents on the dollar, or ten percent of the unpaid principal balance. App. at 705.[11] He explained that this value was a result of "the title who owned the loans [being] in question, the MERS identification, the proceeds of the loans being unknown, incomplete document, no reps and warranties, and generally a poor market." *Id.* Branthover further opined that the value of the Loan Portfolio on August 15, 2008, the earliest date upon which Calyon claimed it could have sold the Loan Portfolio at a reasonable price, was $515,923,065.04 on a servicing retained basis and $510,862,841.14 on a servicing released basis, still far below the Repurchase Price of $994,416,230.32 on that date.[12]

Of note, the Debtor cross examined van Essche about a letter Calyon sent in May 2008 to the Shared National Credit Program ("SNC"),[13] appealing the SNC's rating of the Loan

---

[11] Branthover testified that were there no salability issues the value of the Loan Portfolio would be fifty cents on the dollar. App. at 727.

[12] Branthover did not state, when asked, that his opinion regarding the value of the Loan Portfolio on August 15, 2008 represented a "reasonable" price. He was asked: "[F]ocusing on the August 15th, 2008 value, taking into consideration the facts and circumstances that existed on August 15th, 2008 with respect to the Calyon portfolio, could the Calyon portfolio have been sold on that date for a reasonable price?" App. at 717. Branthover responded: "'Reasonable' is not for me to decide. But I think it could have been sold, yes." *Id.*

[13] "The Shared National Credit Program was established in 1977 by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency to provide an efficient and consistent review and classification of any large syndicated loan." Shared National Credit Program, Federal Reserve.Gov, http://www.federalreserve.gov /econresdata /releases/snc/snc.htm (last visited Jan. 28, 2011).

Portfolio.[14]  In that letter, which van Essche wrote, Calyon had minimized the deficiencies in the Loan Portfolio that van Essche stated at the Bankruptcy hearing adversely affected the portfolio's salability.[15]  Calyon noted in the letter, "the existence of deficiencies does not impact sales value as long as the bank purchasers make and stand behind representations and warranties that would be made in connection with sales." App. at 438.  Moreover, in that letter Calyon disputed the contention that it lacked a desire to liquidate the portfolio under current market conditions, stating that "[t]his is true only because it makes more sense to sell when liquidity in the market recovers, which will result in higher prices.  In the mean time, portfolio collections of P&I and full payoffs continue, thus reducing exposure.  The strategy being employed by holding is to maximize value." *Id.*

The Bankruptcy Court was not persuaded by the testimony of van Essche or Branthover.  Rather, in addressing this issue of first impression, the Bankruptcy Court agreed with the Debtor, concluding the phrase "commercially reasonable determinants of value" is not limited only to the market or sale value of an asset and that the Debtor's proffered method of evaluation, the DCF method, was such a "commercially reasonable determinant of value." *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. 181, 199 (Bankr. D. Del. 2009).

The Bankruptcy Court stated that it was resorting to "first principles." *Id.* at 191.  It began its analysis by concluding that § 562 was ambiguous, in part based on a

---

[14] The SNC review found that Calyon's entire portfolio would have to be classified at 100% Doubtful.  Calyon was concerned with that classification because it would have required it to set a 50% loan loss valuation reserve.

[15] The letter explained that the "difference in selling price caused by the servicing rights issue" was minimal.  App. at 437.

perceived conflict with § 559, the Code provision governing the disposition of excess proceeds upon liquidation of assets under a repurchase agreement. *Id.* at 190. It found the legislative history surrounding § 562 to be "extremely sparse." *Id.* The Bankruptcy Court examined the purpose and intent of the Code provisions relating to repurchase agreements, noting that "the primary purpose of the Code provisions relating to repurchase agreements is to preserve liquidity in the relevant assets, including mortgage loans and interests in mortgage loans." *Id.* at 191. It stated that § 562 "align[s] the risks and rewards associated with an investment in those assets," and prevents the "moral hazard" that would result if damages were measured at a date other than the date of termination, acceleration, or liquidation, such that "the repo participant [here Calyon] could hold the asset at little or no risk." *Id.* "[T]his would make the debtor an insurer of the repo participant's investment even though the debtor has no control over the management of the asset-thus, the moral hazard." *Id.*

In attempting to determine the value of an asset, the Court reasoned that value is the asset's "material or monetary worth, i.e., 'the amount of money, goods, etc., for which a thing can be exchanged and traded.'" *Id.* (*quoting* Shorter Oxford English Dictionary 3495 (6th ed. 2007)). The Bankruptcy Court noted that inefficient or dysfunctional markets may not fairly estimate the potential sale price of an asset. *Id.* at 192. The Bankruptcy Court continued, "[t]here is nothing in section 562 that would imply a limitation on any methodology used to determine value, provided it is commercially reasonable. Indeed, the use of the word *determinants* suggests just the opposite-that *any* commercially reasonable valuation may be used." *Id.* Based on this reasoning, and its concern with the moral hazard the Code is designed to prevent, the Bankruptcy Court concluded that "the phrase 'commercially reasonable determinants of value,' as used in Section 562 of the Code means that any commercially reasonable valuation methodology may be used as evidence of the damages under a repurchase agreement after its rejection, liquidation, termination or acceleration." *Id*. at 193.

14

With respect to whether the DCF method constituted a "commercially reasonable determinant of value," the Bankruptcy Court concluded that it was. The Bankruptcy Court found that the Debtor had overcome its initial burden of rebutting the presumption of validity of Calyon's claims. *Id.* at 196. It found Dr. Clayton credible and his methodology to be generally accepted within the relevant field. *Id.* The Bankruptcy Court found the entirety of Calyon's evidence, which focused on the quality of the loans and their ownership issues, to be irrelevant. *Id.* at 197. That testimony related only to whether Calyon could sell the Loan Portfolio. Significantly, the Bankruptcy Court had concluded that a sale or market price was not the only commercially reasonable determinant of value contemplated by § 562. Moreover, the Bankruptcy Court found van Essche's testimony to be not credible in light of the letter he sent to the SNC. *Id.* at 196-97. The Bankruptcy Court recognized that the representations van Essche made in that letter were directly contradictory to his testimony at the hearing. *Id.*

Accordingly, the Bankruptcy Court sustained the Debtor's objections and ordered the repurchase claims expunged.

## II.

### Jurisdiction

The Bankruptcy Court had jurisdiction pursuant to 11 U.S.C. § 502; 28 U.S.C. §§ 157(b), 1334. Calyon filed a timely notice of appeal from the Bankruptcy Court's judgment. The statute also permits the parties to jointly certify the Bankruptcy Court's order that involves "a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States," 28 U.S.C. § 158(d)(2)(A)(i), which the parties jointly certified in this case. *See also* Fed. R. Bankr. P. 8001(f)(2). Forty-one days after the Bankruptcy Court's judgment, the parties filed their joint certification in the

15

District Court pursuant to 28 U.S.C. § 158(d)(2)(A). We hold that both the joint certification and joint petition for permission to appeal were timely filed. *See* 28 U.S.C. § 158(d)(2)(E); *see also* Fed. R. Bankr. P. 8001(f)(1), (5). We therefore have jurisdiction to entertain the appeal.

## III.

### Analysis

We proceed first with Calyon's argument that the Bankruptcy Court erred (1) in concluding that § 562 is ambiguous and (2) in interpreting the phrase "commercially reasonable determinants of value" to mean that "any commercially reasonable valuation methodology may be used as evidence of the damages under a repurchase agreement after its rejection, liquidation, termination or acceleration." *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. at 193.

The proper construction of the phrase "commercially reasonable determinants of value" in § 562(a) has not, to our knowledge, been previously addressed by any of the courts of appeals. Our role in interpreting the statute is to give effect to Congress' intent. *In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d 248, 254 (3d Cir. 2009). If that intent is made plain, it is unnecessary for us to refer to other cannons of statutory construction, and indeed we should not do so. *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000); *see In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010). To determine whether a statute's meaning is plain, we begin with its text. *Gregg*, 226 F.3d at 257. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Often, that initial inquiry is also the last that need be made. "If the language of a statute expresses Congress's intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *Gregg*, 266 F.3d at 257.

The Supreme Court has indicated a reluctance to

16

declare provisions of the Bankruptcy Code ambiguous. *See In re Price*, 370 F.3d 362, 369 (3d Cir. 2004) (*citing Kelly v. Robinson*, 479 U.S. 36, 43 (1986)). It has instead instructed that courts "not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Kelly*, 479 U.S. at 43 (quotations omitted).

With this instruction in mind, we next return to the text of § 562. That statute provides:

> (a) [I]f a . . . repo participant, . . . liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of--
>
> > (1) the date of such rejection; or
> >
> > (2) the date or dates of such liquidation, termination, or acceleration.
>
> (b) If there are not any **commercially reasonable determinants of value** as of any date referred to in paragraph (1) or (2) of subsection (a), damages shall be measured as of the earliest subsequent date or dates on which there are **commercially reasonable determinants of value**.

11 U.S.C. § 562 (emphasis added).

The Bankruptcy Court declared § 562 "ambiguous as to whether (i) the damage calculation is limited to either selling the assets or checking the market price of those assets; or (ii) damages may be measured by some other commercially reasonable method." *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. at 191. It found that this ambiguity was a result of the "conflict" between § 562 and § 559. *Id.* at 190. We are not persuaded that there is any conflict between § 562 and § 559 in the Bankruptcy Code.

Section 559, to which the Bankruptcy Court referred,

17

provides in relevant part:

> *In the event* that a *repo participant . . . liquidates one or more repurchase agreements* with a debtor and under the terms of one or more such agreements has agreed to deliver assets subject to repurchase agreements to the debtor, any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to the available rights of setoff.

11 U.S.C. § 559 (emphasis added).

Sections 559 and 562 address different situations. Section 559 applies only in the event that a repurchase agreement is liquidated, and the liquidation results in excess proceeds (where the proceeds from the market prices exceed the stated repurchase prices). If any assets are not disposed of on the date of liquidation, those assets are valued at the prices available at the time of liquidation from a generally recognized source or the most recent closing bid quotation from such a source. On the other hand, § 562 which covers, inter alia, repurchase agreements, applies when the contract is liquidated, terminated, or accelerated, and results in *damages* rather than excess proceeds.

We see no conflict between these provisions and therefore agree with Calyon in rejecting the Bankruptcy Court's conclusion that § 562 is ambiguous because it is in conflict with § 559. The fact that the parties proffer different interpretations of the statutory language does not make the language ambiguous. It just makes the court's role difficult in deciding which interpretation is persuasive.

18

Calyon's second argument with the Bankruptcy Court's conclusion that the market or sale price is not the only reasonable determinant of value of the asset is the centerpiece of Calyon's position in this case. The Debtor responds that because the market was dysfunctional there was no commercially reasonable market value on the Acceleration Date.

Calyon's proofs of claim carried a presumption of validity. Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."); *see also* 11 U.S.C. § 502(a) (claim deemed allowed unless party in interest objects). It was therefore the Debtor's initial burden to rebut the presumption of the validity of Calyon's proofs of claim. This entailed a demonstration that Calyon's reliance on the market value was not "commercially reasonable" but that other commercially reasonable determinants of value existed as of the Acceleration Date. *See* 11 U.S.C. § 562(c)(2) (if damages not measured as of date of acceleration and trustee objects, repo participant has burden to show that no commercially reasonable determinants of value existed as of that date); H.R. Rep. No. 109-31, at 135 (2005).[16]

In the Bankruptcy Court, the Debtor proffered at least two methodologies to determine damages that it claimed were "commercially reasonable determinants of value" that existed on the Acceleration Date. One was the DCF based largely on the testimony of its expert witness, Dr. Clayton. The other was market analyses that Calyon had obtained outside of the context of this litigation. The Bankruptcy Court concluded that the latter was not a commercially reasonable determinant of the Loan Portfolio's value because the market was

---

[16] *See* 11 U.S.C. § 101(46) ("repo participant" means "an entity that, at any time before the filing of the petition, has an outstanding repurchase agreement with the debtor").

19

distressed. *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. at 198. The Debtor does not press this issue on appeal and instead limits its proposed alternative commercially reasonable determinant of value to the DCF methodology. The Debtor principally relied on the testimony of Dr. Clayton to support its position. His testimony is discussed in detail above. *See* text and accompanying notes at Typescript Op. at 7-9.

Dr. Clayton testified that the DCF valuation methodology is a particularly apt methodology for valuing debt instruments such as mortgage loans where the owner is receiving the cash flows. As he explained, the assets "are held for the cash flow, not for the distress sale in the market." App. at 550. Only in unusual circumstances will the cash flow valuation differ from the market price.

Calyon's challenge to the use of the DCF valuation method as a commercially reasonable determinant of value is essentially directed to what it argues are the deficiencies in the Loan Portfolio. Among those deficiencies are what it claims is the DCF's failure "to account for the subsequent deterioration of credit performance." Appellant's Br. at 47. Calyon's experts also focused their testimony on problems they saw with the loans, such as the dispute regarding the ownership of the loans, the direction of the proceeds, and questions regarding the servicing. As the Bankruptcy Court recognized, these problems relate to the difficulties that would affect the market price or sale price of the Loan Portfolio, were it placed on the market for sale.

The Bankruptcy Court stated,

> Even if the Court were to find Mr. van Essche's testimony on this issue credible, it would have no effect on the Court's conclusion. The Court finds that the issues regarding the quality of the loans and their ownership are irrelevant to the issue of whether "commercially reasonable determinants of value" existed on the Acceleration Date. The evidence submitted shows

that, from the time of the Acceleration Date, *Calyon had no intention of selling the Loan Portfolio due to the dysfunctional state of the market*.  Because Calyon's intent was to hold the loans, and not sell them, testimony regarding the variables that might have had an impact on a sale price is not relevant.  Moreover, the entire issue appears to be one contrived solely for purposes of this litigation.  Accordingly, the Court will not consider the problems with the loans in its analysis and, even if it were to do so, would give such problems minimal weight.

411 B.R. at 197 (footnote omitted) (emphasis added).

The Bankruptcy Court thus honed in on the intrinsic problem with Calyon's position in this case.  All the parties agree that the secondary mortgage market was dysfunctional on the Acceleration Date, and because of that market condition, it was not reasonable to sell the Loan Portfolio.  Indeed, Calyon made no effort to sell the Loan Portfolio.  Instead, it retained the Loan Portfolio and received and retained the income generated by the mortgages that constituted that portfolio.

We find the Bankruptcy Court's analysis persuasive.  It stated that the market price should be used to determine an asset's value when the market is functioning properly.  It is only when the market is dysfunctional and the market price does not reflect an asset's worth should one turn to other determinants of value. *Id.* at 193 ("When a sale would be unreasonable or cannot be performed one turns to the market price, [h]owever, if a market price is unavailable or the market is disrupted or dysfunctional one must use a different method to discover the value of the asset.").

We agree with the Debtor's characterization of the logical flaw in Calyon's position that only the market price should be considered.  It states, "In cases like the case at bar, where the court concludes that a valuation methodology other than a market value (in a dysfunctional market context)

evidences that the asset's value exceeds the underlying repurchase price obligation, the result is not that the counter-party is deprived of recourse to recover its damages, but rather that the counter-party has incurred no damages capable of being recovered." Appellee's Br. at 35. Accordingly, we do not share Calyon's concern that our reading of § 562 of the Code will chill the repurchase agreement market. To the contrary, as the Bankruptcy Court stated, Calyon's interpretation involves a moral hazard that is counter to the policy of preserving liquidity. *See* Typescript Op. at 14. In short, if Congress had intended § 562 to be limited to market or sale price, it would have said so. It did so in § 559.

The Bankruptcy Court agreed with the Debtor's analysis. It concluded that Calyon did not meet its burden of demonstrating that no commercially reasonable determinant of value existed on the Acceleration Date. It found credible the testimony of Dr. Clayton that the DCF analysis is a commercially reasonable methodology for determining the value of the Loan Portfolio, and that a DCF analysis of the Loan Portfolio showed the value of the loans was either $1,162,817,745.15 (servicing included with mortgages) or $1,148,282,523.34 (servicing not included with mortgages). It found that Calyon's argument that the quality of the Loan Portfolio prevented it from obtaining a commercially reasonable price at market on the Acceleration Date to be irrelevant, noting that Calyon's position in the litigation was not credible because it was far different than the position it took with the SNC during its review process. It characterized Calyon's testimony as appearing litigation driven.

The Bankruptcy Court also found the testimony of Calyon's expert witness to be irrelevant and "that Calyon's internal valuation analysis and the market analyses performed by Calyon's advisor, Compass, do not fairly reflect the Loan Portfolio's market value as of that date because the market was dysfunctional." *In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. at 199.

Accordingly, the Bankruptcy Court found that "the

22

value of the Loan Portfolio exceeds the amount of Calyon's Claim" and that as a result "Calyon has no deficiency claim and therefore no damage claim under Section 562." *Id.* The Court thus concluded that Calyon has shown no damages under § 562 and sustained the Debtor's objections to the repurchase claims and directed expunging those repurchase claims.

We hold that Bankruptcy Judge Sontchi's findings and conclusions are persuasive and supported by the evidence. We will therefore affirm the Bankruptcy Court's order.

RENDELL, <u>Concurring</u>.

I join in Judge Sloviter's fine opinion and write separately only to note that while I was initially skeptical of Judge Sontchi's view that a valuation based on discounted cash flow (DCF) was an appropriate "commercially reasonable determinant[ ] of value" of a repurchase agreement, I now wholeheartedly endorse this view. The factors that I believed, at first, warranted the conclusion that sale price was the only "commercially reasonable determinant[ ] of value" of a repurchase agreement were twofold: first, the Bankruptcy Code treats repurchase agreements differently, permitting these transactions to be exempt from the automatic stay provisions because of the need for their liquidity. 11 U.S.C. § 559; *See American Home Mortgage Holdings, Inc.,* 411 B.R. 181, 190 (Bankr. D. Del. 2009); *See Also Bankruptcy Law and Repurchase Agreements: Hearings on S. 445 Before the Subcomm. on Monopolies and Commercial Law of the Senate Comm. on the Judiciary,* 98th Cong., 1st Sess. 306 (1983) (Statement of Peter Sternlight, Executive Vice President, Federal Reserve Bank of New York). Accordingly, I thought, their value in a sale, i.e. a liquidation, should provide the basis for damages. Second, the term 'commercially reasonable' is usually associated with 'disposition', such that it anticipates a sale. *Black's Law Dictionary* 305 (9th ed. 2009); U.C.C. § 9-610 (b).

However, I now conclude that Judge Sontchi was correct for three reasons. First, the statute clearly uses the plural of "determinants" so that sale price should not be viewed as exclusive. Second, while admittedly 'commercially

1

reasonable' is linked most often with 'disposition', the determination of what is 'commercially reasonable' involves a fact-intensive inquiry, dependent on the totality of the circumstances, and calls for an examination of the particular situation, which may not include a sale. *See United States* v. *Tabor Court Realty Corp.*, 803 F.2d 1288, 1306 (3d Cir. 1986); *See also Victaulic v. Tieman,* 499 F.3d 227, 235 (3d Cir. 2007)("[T]he determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances." (*quoting WellSpan Health v. Bayliss,* 869 A.2d 990, 999 (Pa. Super. Ct. 2005))).  Third, and along those same lines, here, Calyon acknowledges that it has retained the mortgages and is receiving the monthly payments, i.e. the cash flow.  Given this particular fact setting, a "determinant[ ] of value" that would appear to be "commercially reasonable" – indeed, perhaps the most reasonable – is DCF because Calyon clearly has determined that it will maximize its value by retaining the mortgages, preferring to receive the cash flow over time, rather than selling them.  Thus, I believe Judge Sontchi was correct, as are we, and Calyon has no damage claim.