In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 12-2463, 12-2464, 12-2493, 12-2494 & 12-2495

RONALD R. PETERSON, as Trustee for the estates of Lancelot
Investors Fund, L.P., and related entities,

*Plaintiff-Appellant,*

*v.*

SOMERS DUBLIN LTD., *et al.*,

*Defendants-Appellees.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 B 28225 — **Jacqueline P. Cox**, *Bankruptcy Judge.*

———————

ARGUED APRIL 8, 2013 — DECIDED SEPTEMBER 6, 2013

———————

Before EASTERBROOK, *Chief Judge*, and BAUER and SYKES,
*Circuit Judges.*

EASTERBROOK, *Chief Judge*. After Gregory Bell's mutual
funds, known as the Lancelot or Colossus group (collectively
"the Funds"), folded in late 2008, their trustee in bankruptcy
filed many independent suits or adversary actions seeking to
recover from solvent third parties. Last year we considered

the Trustee's claims against the Funds' auditor. *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594 (7th Cir. 2012). These appeals concern the Trustee's claims against some of the Funds' investors, which the Trustee believes received preferential transfers or fraudulent conveyances. Another appeal, also decided today, addresses a suit against one of the Funds' law firms.

The Funds invested in notes issued by Thousand Lakes, LLC, and other ventures operated by Thomas Petters. For simplicity we refer to Thousand Lakes as the only borrower. Although Bell may have believed at the outset that Thousand Lakes was a commercial factor—that is, a lender financing other businesses' inventory—Petters did not have customers and was running a Ponzi scheme, paying old investors with newly raised money. Ponzi schemes must grow to survive, and eventually they collapse when they cannot maintain the necessary growth. See Saul Levmore, *Rethinking Ponzi-Scheme Remedies in and out of Bankruptcy*, 92 Boston U. L. Rev. 969 (2012).

In fall 2007 Thousand Lakes stopped remitting money to the Funds. It contended that Costco, a customer, had been late in paying; the Funds extended the notes' due dates. By February 2008 Thousand Lakes still had not paid, and Bell at last discovered the problem. (He may have learned earlier, or been wilfully blind to what Petters was doing, but we need not decide.) Instead of taking the news to prosecutors, Bell began operating the Funds as a second-tier Ponzi scheme. He placed "new" investments with Thousand Lakes, which used the money the same day to repay outstanding notes. These round-trip transactions meant that the Funds were not receiving any net cash from Thousand Lakes

and thus needed to pay their own investors, when they sought to redeem shares, with newly raised money. But by fall 2008 that was no longer possible. Both the Funds and Petters's empire collapsed; about 60% of the roughly $2.5 billion nominally held by the Funds had been stolen or disappeared. Bell pleaded guilty to fraud and was sentenced to 37 months' imprisonment. Petters denied liability but was convicted after a trial and sentenced to 50 years' imprisonment. *United States v. Petters*, 663 F.3d 375 (8th Cir. 2011).

The Trustee contends in the current proceedings, filed as adversary actions in the Funds' bankruptcy, that investors who redeemed shares before the bankruptcy received preferential transfers, 11 U.S.C. §547, or fraudulent conveyances, 11 U.S.C. §548(a)(1)(B). The Trustee also invoked the Illinois fraudulent-conveyance statute, using the avoiding power of 11 U.S.C. §544. These parts of the Bankruptcy Code allow trustees to recoup payouts for the benefit of all creditors. The bankruptcy judge granted summary judgment to the investors, 467 B.R. 643 (Bankr. N.D. Ill. 2012), relying on 11 U.S.C. §546(e), which provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity

contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

Deleting words not relevant to the current dispute, and omitting ellipses, we have: "the trustee may not avoid a settlement payment or transfer made to a financial participant in connection with a securities contract, except under section 548(a)(1)(A) of this title."

The bankruptcy court entered its decision on May 11, 2012, and on May 24 the Trustee appealed to the district court. The Trustee and the defendants agreed to request direct review by this court, bypassing a district judge, as 28 U.S.C. §158(d) allows. Certifications under Fed. R. Bankr. P. 8001(f) were filed on June 19 and 20, and a joint petition under Fed. R. App. P. 5 was filed on July 16. This court authorized the appeals but directed the parties to discuss whether they are timely. That is the first question we must address—and, if the papers are late, we must decide whether any problem is a jurisdictional defect.

An interlocutory appeal from a bankruptcy judge's decision to the court of appeals requires three steps: first a certification by the bankruptcy judge, district judge, or the parties acting jointly; second a petition to the court of appeals under Rule 5; and finally a discretionary decision by the court of appeals. Bankruptcy Rule 8001(f)(3)(A) says that a "request" for certification must be filed "within the time specified by 28 U.S.C. § 158(d)(2)". This provision governs requests by a party to a judge. Rule 8001(f)(4) covers certification on a judge's initiative. As far as we can see Rule 8001 does not set a time limit for certification on a judge's initiative or by agreement of the litigants. *In re American Mortgage*

*Holdings, Inc.*, 637 F.3d 246, 254 (3d Cir. 2011), says that the outer limit for the parties' joint certification is 60 days, which it drew from §158(d)(2)(E). But that provision deals with a request to a judge, not with the litigants' joint certification. Section 158(d)(2)(E) reads: "Any request under subparagraph (B) for certification shall be made not later than 60 days after the entry of the judgment, order, or decree." Subparagraph (B) deals with judicial certification, while subparagraph (A) is what authorizes certification by the parties.

We have considered the possibility that Rule 5(a)(2) supplies a time limit. It reads: "The petition must be filed within the time specified by the statute or rule authorizing the appeal or, if no such time is specified, within the time provided by Rule 4(a) for filing a notice of appeal." Because Bankruptcy Rule 8001(f) does not supply a time, Appellate Rule 5(a)(2) sends us to Appellate Rule 4(a), which specifies 30 days. By that standard, the joint certification would be late. But Rule 5(a) deals with petitions for leave to appeal—the second step in the process under §158(d)—rather than with certifications by judges or litigants. The parties' petition under Rule 5(a) came within 30 days of the joint certification, so Rule 5(a) has been satisfied.

This leaves the conclusion that there is no time limit for a joint certification. Probably none is necessary. If the parties take too long, the court of appeals can deny the petition for interlocutory review. But whether or not a time limit would be a good idea, a court must follow the statute and rules as written. See, e.g., *Spivey v. Vertrue, Inc.*, 528 F.3d 982 (7th Cir. 2008).

If we are wrong about this, and there is either a 30-day limit from Rules 4(a) and 5(a) or a 60-day limit from

§158(d)(2)(E), we still would hear these appeals, which present legal issues not yet addressed in this circuit. If the limit is 60 days, the certifications are timely. And if the limit is 30 days, none of the parties has asked us to dismiss the appeal on that account. The time established by Rule 5(a) is not a limit on appellate jurisdiction. See *In re Turner*, 574 F.3d 349, 354 (7th Cir. 2009).

Statutory time limits for appeal can be jurisdictional, see *Bowles v. Russell*, 551 U.S. 205 (2007), but time limits in the Rules of Appellate Procedure are not. See *United States v. Neff*, 598 F.3d 320 (7th Cir. 2010); *Carter v. Hodge*, No. 13-2243 (7th Cir. Aug. 8, 2013). See also *Kontrick v. Ryan*, 540 U.S. 443 (2004) (time limits in Federal Rules of Bankruptcy Procedure are not jurisdictional). A mandatory, though non-jurisdictional, rule must be enforced if a party invokes its protection, but no one wants us to dismiss these appeals.

A second issue potentially affects jurisdiction. *Stern v. Marshall*, 131 S. Ct. 2594 (2011), holds that bankruptcy judges, who lack tenure under Article III of the Constitution, cannot entertain certain actions by debtors or trustees in bankruptcy. We concluded in *In re Ortiz*, 665 F.3d 906 (7th Cir. 2011), that, when a bankruptcy judge is not entitled to enter a dispositive order, 28 U.S.C. §158(d) does not allow the court of appeals to review the decision; instead the case must be heard initially by a district judge.

The parties, well aware of *Stern*, sought to eliminate any problem by consenting to the bankruptcy court's exercise of jurisdiction. It is established that parties may consent to the entry of final decision by a magistrate judge under 28 U.S.C. §636(c), followed by an appeal that bypasses the district court, even though a magistrate judge lacks Article III ten-

ure. See, e.g., *Roell v. Withrow*, 538 U.S. 580 (2003); *Geras v. Lafayette Display Fixtures, Inc*., 742 F.2d 1037 (7th Cir. 1984); *Gibson v. Gary Housing Authority*, 754 F.2d 205 (7th Cir. 1985). The parties assumed that consent to decision by a bankruptcy judge would be treated the same way. But a panel stated in *Wellness International Network, Ltd. v. Sharp*, No. 12-1349 (7th Cir. Aug. 21, 2013), that Article III forbids decision by a bankruptcy judge on the basis of a party's waiver.

The issue in *Wellness International Network* was forfeiture rather than waiver. None of the parties objected to the bankruptcy judge's handling of the case until it reached the district court, when the loser in the bankruptcy court first relied on *Stern*. A case pending in the Supreme Court—*In re Bellingham Insurance Agency, Inc*., 702 F.3d 553 (9th Cir. 2012), cert. granted under the name *Executive Benefits Insurance Agency v. Arkison*, 133 S. Ct. 2880 (2013) (No. 12-1200)—likewise arises from a belated objection rather than a unanimous consent.

*Wellness International Network* did not discuss this circuit's decisions in *Geras* or *Gibson*, which hold that consent on the record authorizes decision by an untenured magistrate judge, even though the parties' failure to object does not. The panel also reserved judgment on the constitutionality of 28 U.S.C. §157(c)(2), which authorizes the parties to consent to adjudication by a bankruptcy judge of certain proceedings that otherwise would go to a district judge. *Wellness International Network*, slip op. 39. So we think the effect of an express and mutual waiver open in this circuit. Given the grant of certiorari in *Executive Benefits Insurance Agency*, the fact that the parties have not filed briefs discussing the distinction between waiver and forfeiture, and the fact that the

bankruptcy court's authority over these proceedings does not depend on consent, we do not try to resolve today whether waiver and forfeiture should be treated the same way.

The current dispute comes within a bankruptcy judge's authority, notwithstanding *Stern*, because all of the defendants submitted proofs of claim as the Funds' creditors and thus subjected themselves to preference-recovery and fraudulent-conveyance claims by the Trustee. See 11 U.S.C. §502(d). The Supreme Court held in *Katchen v. Landy*, 382 U.S. 323, 329–36 (1966), and *Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990), that Article III authorizes bankruptcy judges to handle avoidance actions against claimants. See also *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33, 57–59 (1989). *Stern* stated that its outcome is consistent with those decisions. 131 S. Ct. at 2616–18. *Wellness International Network* likewise observes (slip op. 44–45) that there is no constitutional problem when a bankruptcy judge adjudicates a trustee's avoidance actions against creditors who have submitted claims. The bankruptcy judge thus acted within her authority, and 28 U.S.C. §158(d) allows a direct appeal.

To the merits. Here again is the short version of §546(e): "the trustee may not avoid a settlement payment or transfer made to a financial participant in connection with a securities contract, except under section 548(a)(1)(A) of this title." The Trustee does not deny that entities that invested in the Funds were "financial participants"—a term that 11 U.S.C. §101(22A) defines as an investor whose stake exceeds $1 million, which was the Funds' minimum-purchase requirement—or that, when the Funds redeemed some or all of an investor's holdings, a "transfer [was] made" to that investor.

It seems to follow that the transfer cannot be recovered "except under section 548(a)(1)(A) of this title." That subparagraph covers a payment "made … with actual intent to hinder, delay, or defraud any entity to which the debtor was or became … indebted".

The Trustee did not rely on §548(a)(1)(A) in the bankruptcy court or his appellate briefs. At oral argument the Trustee confirmed that he made a conscious choice not to invoke the exception. We are puzzled by that decision, because "actual intent to … defraud" seems an apt description of a Ponzi scheme's payouts. The round-trip transactions that began in February 2008 extended the life of the Petters scam and turned the Funds themselves into a Ponzi scheme. Such schemes can operate only as long as they pay existing investors' claims. Once they stop paying old investors, new investments stop coming in and the scams collapse. Thus ongoing payments are integral to the fraud. Although some of the payments the Trustee wants to recover predate February 2008, the Trustee has contended in other litigation that Bell knew the truth about Petters's business earlier; and, at all events, even if the §548(a)(1)(A) exception to §546(e) were available only for payments the Funds made after Bell threw in with Petters, still some recovery is better than none. The Trustee said at oral argument that he understands the exception to be limited to an investor's profits, as opposed to the return of principal, in light of §548(c). Given the Trustee's decision not to rely on the exception, we need not decide whether that understanding is correct.

What the Trustee does contend is that §546(e) contains some ambiguities, such as what is a "settlement payment" and when is a payment made "in connection with" a securi-

ties or commodities contract. "Settlement payment" is a defined term, but the definitions in 11 U.S.C. §§ 101(51A) and 741(8) are circular. Section 741(8) says that a settlement payment "means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade". Section 101(51A) has similar language about the commodities trade. "In connection with" does not have a definition in the Bankruptcy Code—or for that matter the statutes covering the commodities and securities businesses.

Given statutory ambiguity, the Trustee turns to the legislative history. It is easy to sum up what the Trustee finds there: Congress enacted §546(e) to ensure that honest investors will not be liable if it turns out that a leveraged buyout (LBO) or other standard business transaction technically rendered a firm insolvent. For a recap of the legislative history see Peter S. Kim, *Navigating the Safe Harbors: Two Bright Line Rules to Assist Courts in Applying the Stockbroker Defense and the Good Faith Defense*, 2008 Colum. Bus. L. Rev. 657. Often the goal of a transaction is to replace equity with debt in order to change managers' incentives. If the business fails, a trustee may attempt to argue that the very nature of the transaction made the debtor insolvent and subjected the investors to liability. Section 546(e) prevents that. The Trustee concludes that §546(e) is designed "to protect this country's legitimate market transactions that promote the stability of and confidence in the financial markets." But the Funds were not operating "legitimately" at the end and were conduits for the Petters scam all along. The Trustee concludes from this that §546(e) is irrelevant.

It is fair to say that some courts have been restive at the idea that people who received money from a crooked enterprise can keep it, to the detriment of other investors who did not get out while the going was good, and have interpreted §546(e) narrowly. See the discussion in Samuel P. Rothschild, *Bad Guys in Bankruptcy: Excluding Ponzi Schemes From the Stockbroker Safe Harbor*, 112 Colum. L. Rev. 1376 (2012). For example, *In re Slatkin*, 525 F.3d 805 (9th Cir. 2008), and *In re Wider*, 907 F.2d 570 (5th Cir. 1990), hold that the operators of particular Ponzi schemes were not "stockbrokers" for the purpose of the statute, which therefore did not block recoupment. But the second circuit has held §546(e) fully applicable to businesses that engaged in fraud. See *In re Quebecor World (USA) Inc.*, 719 F.3d 94 (2d Cir. 2013) ("transfer" has its normal meaning); *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329 (2d Cir. 2011) ("settlement payment" has its normal meaning).

The Trustee is not asking us to choose sides in a debate about interpretive method so much as he is asking us to chuck §546(e) out the window. Yet a court can't say "this statute is ambiguous, so we will implement the legislative history unencumbered by enacted text." Ambiguity sometimes justifies resort to legislative history, but it is used to decipher the ambiguous language, not to replace it. The text is what it is and must be applied whether or not the result seems equitable. See, e.g., *Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2044 (2012); *Dodd v. United States*, 545 U.S. 353, 359–60 (2005); *In re Draiman*, 714 F.3d 462, 465–66 (7th Cir. 2013). If the Trustee were right that §546(e) is irrelevant when the debtor in bankruptcy had any role in a fraud, why did Congress add the exception referring to §548(a)(1)(A)?

The presence of an exception for actual fraud makes sense only if §546(e) applies as far as its language goes.

Statutes often are written more broadly than their genesis suggests. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2073 (2012), tells us that "[t]he Bankruptcy Code standardizes an expansive (and sometimes unruly) area of law, and it is our obligation to interpret the Code clearly and predictably using well established principles of statutory construction." We apply the text—which both Houses of Congress approved and the President signed—not themes from a history that was neither passed by a majority of either House nor signed into law.

The Trustee has not referred us to any legislative history about the meaning of "settlement payment" or "in connection with", the phrases he thinks ambiguous. The second circuit held in *Enron* that "settlement payment" means what it ordinarily does in the securities business: the financial settling-up after a trade. 651 F.3d at 339. Brokers will sell customers' shares of stock on the market without having them in hand. The customer later turns over the stock and receives the proceeds; that's the settlement for the transaction. Here the investors told the Funds to redeem some of their shares; the swap of money for shares was a settlement payment. And, as *Quebecor* holds, "transfer" is a more comprehensive term and usually makes it unnecessary to decide whether a given transaction entailed a "settlement payment". 719 F.3d at 98. A "transfer" from the Funds to each redeeming investor undoubtedly occurred. As for "in connection with": decisions such as *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), and *United States v. O'Hagan*, 521 U.S. 642 (1997), show that it is more than comprehensive

enough to cover the Funds' redemption of the investors' shares.

The Trustee's only textual argument is that fraudulent schemes do not have "securities" for the purpose of §546(e). That contention is hard to fathom, given that a principal goal of securities laws is to control fraud. If the existence of fraud meant that an instrument were not a "security", then the main federal means to deal with financial fraud would vanish. Section 741(7) of the Bankruptcy Code provides that a "securities contract" is a contract for the purchase or sale of a security, and §101(49)(A)(ii) says that security includes stock. The definition in §101(49) comes almost verbatim from the Securities Act of 1933 and the Securities Exchange Act of 1934. No one doubts that shares of stock issued by crooked mutual funds or hedge funds are "securities" for the purpose of the 1933 and 1934 Acts. They are "securities" for the purpose of §546(e) as well.

Other arguments need not be discussed in light of our conclusion that §546(e) defeats the Trustee's actions. The judgments of the bankruptcy court are affirmed.