RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: QSI HOLDINGS, INC.;
QUALITY STORES, INC.,

                                    *Debtors.*

_____

QSI HOLDINGS, INC.; QUALITY STORES, INC.,
                        *Plaintiffs-Appellants,*

          *v.*

DENNIS E. ALFORD, et al.,
                        *Defendants-Appellees.*

No. 08-1176

_____

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 06-00876—Janet T. Neff, District Judge.

Argued: March 4, 2009

Decided and Filed: July 6, 2009

Before: NORRIS, COOK, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** John K. Cunningham, WHITE & CASE LLP, Miami, Florida, for Appellants. Boyd A. Henderson, MILLER JOHNSON, Grand Rapids, Michigan, for Appellees. **ON BRIEF:** John K. Cunningham, Matthew C. Brown, WHITE & CASE LLP, Miami, Florida, Glenn M. Kurtz, WHITE & CASE LLP, New York, New York, Robert S. Hertzberg, PEPPER HAMILTON LLP, Detroit, Michigan, Benjamin M. Mather, Michael H. Reed, PEPPER HAMILTON LLP, Philadelphia, Pennsylvania, for Appellants. Boyd A. Henderson, MILLER JOHNSON, Grand Rapids, Michigan, for Appellees.

_____

**OPINION**

_____

ALAN E. NORRIS, Circuit Judge. In this appeal, we must determine whether § 546(e) of the Bankruptcy Code applies to privately traded securities. If that is indeed the case, then the settlement payments made to defendant shareholders are exempt from

1

avoidance. This is an issue of first impression in this circuit and we now hold, as did the bankruptcy and district courts below, that § 546(e) is not limited to publicly traded securities but also extends to transactions, such as the leveraged buyout at issue here, involving privately held securities.

**I.**

"When reviewing an order of a bankruptcy court on appeal from a decision of a district court, this Court 'review[s] the bankruptcy court's order directly and give[s] no deference to the district court's decision.'" *LPP Mortgage, Ltd. v. Brinley*, 547 F.3d 643, 647 (6th Cir. 2008) (quoting *In re Lee*, 530 F.3d 458, 463 (6th Cir. 2008)).  We review the bankruptcy court's resolution of questions of law *de novo* and questions of fact for clear error.  *In re Triple S Rests., Inc.*, 519 F.3d 575, 578 (6th Cir. 2008). The facts in this appeal are uncontested and hence our review is *de novo*.

Because the facts are not in dispute, we rely upon the bankruptcy court's recitation to set the stage for our discussion:

> This adversary proceeding arises from the 1999 leveraged buyout ("LBO") of the Debtor, Quality Stores, Inc. ("Quality"). The Plaintiffs, QSI Holdings, Inc. and Quality, acting through their chief litigation officer (collectively, the "Plaintiffs"), seek to avoid payments made to approximately 170 shareholders of Quality (the "Defendants") resulting from the LBO. Almost all of the Defendants have filed motions for summary judgment asserting that the transfers are exempt from avoidance based on the settlement payment defense in § 546(e) of the Bankruptcy Code. Accordingly, the legal issue presented is whether the transfers from the disbursing agent to the Defendants are exempt from avoidance because they constitute "settlement payments" made by a "financial institution" under § 546(e).
>
> . . . .
>
> . . . Quality was a privately held corporation that operated a chain of retail stores specializing in agricultural and related products. In 1999, Quality and certain of Quality's principal shareholders entered into a merger agreement with Central Tractor Farm and Country, Inc. ("Central Tractor") and its parent company, CT Holdings, Inc. (collectively the "CT Parties"). Pursuant to the agreement, Quality was to merge with and into Central Tractor, with the surviving entity changing its name to Quality Stores, Inc. The agreement also called for Quality's shareholders to be paid, in cash or stock, for their respective equity interests. The assets of both Quality and

Central Tractor were pledged as collateral for the loan that was obtained and partially utilized to pay the Quality shareholders.

The total purchase price for the LBO was approximately $208 million. Of this amount, Quality's shareholders were to receive $111.5 million in cash with $91.8 million of stock in CT Holdings, Inc. Central Tractor also agreed to assume and pay $42.1 million of Quality's existing indebtedness.

The Quality LBO involved both individual shareholders and company employees who were shareholders by virtue of their participation in Quality's Employee Stock Ownership Trust ("ESOT"). To effectuate the securities transaction contemplated by the LBO, the CT Parties made a $111.5 cash payment to their exchange agent, HSBC Bank USA ("HSBC Bank"). HSBC Bank collected the shares of Quality stock from individual shareholders. It then transferred the securities to the CT Parties and distributed the cash, or shares in CT Holdings, Inc., to the individual shareholders.

For the ESOT shareholders, many of whom were lesser paid and mid-level Quality employees, the settlement process involved one additional step. Most of the ESOT stock was held by the ESOT trustee, LaSalle Bank. LaSalle Bank tendered the shares of Quality stock to HSBC Bank and received the cash consideration. The ESOT was eventually terminated and the funds were distributed by LaSalle Bank to the ESOT participants.

As a result of the merger, Quality incurred substantial integration costs. The merged company also implemented a costly expansion plan which aggressively contemplated the opening of twenty-five to fifty new stores each year. These business decisions, and others, contributed to continuing financial difficulties which eventually led a group of petitioning creditors to file an involuntary bankruptcy petition against Quality during October 2001. In response, before an order for relief was entered, Quality filed a voluntary petition under chapter 11 on November 1, 2001.

The Plaintiffs filed this fraudulent conveyance action on October 31, 2003. The complaint, as amended, alleges that the Defendants gave less than reasonably equivalent value when they tendered their Quality stock for cash as part of the LBO. The complaint further alleges that the LBO left Quality with unreasonably small capital and caused it to incur debts beyond its ability to pay. The Plaintiffs seek to avoid and recover the LBO transfers as constructively fraudulent conveyances pursuant to 11 U.S.C. § 544, § 550, and the Michigan Uniform Fraudulent Transfer Act, Mich. Comp. Laws Ann. §§ 566.31 et seq. The Defendants' motions for summary judgment assert that the LBO transfers were settlement payments made by a financial institution. Therefore, the Defendants seek dismissal of this adversary proceeding because they contend that the transfers are exempt from avoidance under § 546(e).

*In re Quality Stores, Inc.*, 355 B.R. 629, 631-32  (Bankr. W.D. Mich. 2006) (footnote omitted).

## II.

### A.  Statutes at Issue

Section 546(e) provides as follows:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or *settlement payment*, as defined in section 101 or 741 of this title, made by or to a commodity broker, forward contract merchant, stockbroker, *financial institution*, financial participant, or securities clearing agency that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e) (version in effect prior to December 12, 2006) (emphasis added). Section 741(8), in turn, defines "settlement payment" as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8).

### B.  Did the LBO at Issue Involve a Settlement Payment as Defined by § 546(e)?

Plaintiffs frame the central issue on appeal as "whether payments made to purchase *non-public* securities in a leveraged buyout can be exempted from avoidance pursuant to section 546(e) of the Bankruptcy Code by merely funneling [them through] a financial institution."  In their view, Congress intended that § 546(e) "insulate the nation's public securities markets from the adverse effects of a bankruptcy, so as not to cause a ripple effect in such markets by unwinding settled securities transactions."

When construing a statute we look first to its text. Where that language is plain, "the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. U. S. Trustee*, 540 U.S. 526, 534 (2004) (quotation omitted);  *see also Thompson v. North American Stainless*, *L.P.*, ____F.3d____, 2009 WL 1563443, *2 (6th Cir. June 5, 2009) (en banc).

Numerous courts, including the courts below, have acknowledged that the definition of "settlement payment" set out in § 741(8) is somewhat "circular." *See Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 848 (10th Cir. 1990); *QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 740 (W.D. Mich. 2007) (citing *Kaiser Steel*); *In re Quality Stores, Inc.*, 355 B.R. 629, 633 (Bankr. W.D. Mich. 2006) (same). Nonetheless, courts have recognized that the definition is "extremely broad." *See Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009) (citing *Kaiser Steel*, 913 F.2d at 848 (quoting *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 878 F.2d 742, 751 (3d Cir. 1989)); *In re Resorts Int'l, Inc.*, 181 F.3d 505, 514-15 (3d Cir. 1999); *In re Comark*, 971 F.2d 322, 326 (9th Cir. 1992)).

With this in mind, we turn to the definition of "settlement payment." For the purposes of this appeal, the critical phrase in the definition is the final one: the payment must be one "commonly used in the securities trade." 11 U.S.C. § 741(8). Plaintiffs take issue with the lower courts' failure to consider whether the LBO contained the hallmarks of a payment made in the securities trade. Specifically, they fault the district court for basing its broad reading of "settlement payment" upon decisions that involve public, not private, securities transactions. They would have us look to the legislative history of § 546(e). That history is recounted briefly in *Kaiser Steel*:

> In 1982, Congress was concerned about the volatile nature of the commodities and securities markets, so former section 764(c) was replaced by sections 546(e) and 741(5) and (8) "to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market." H.R.Rep. No. 420, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 583, 583. The protection was expanded beyond the ordinary course of business to include margin and settlement payments to and from brokers, clearing organizations, and financial institutions. Again, Congress's purpose was "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries." *Id.* at 1, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 583.

913 F.2d at 849 (footnote and quotation omitted). In *Kaiser Steel*, the court went on to conclude that "the transfer of consideration in an LBO is consistent with the way 'settlement' is defined in the securities industry." *Id.*

However, *Kaiser Steel* involved publicly traded securities. The question posed here is whether its logic extends to privately traded securities. In a case involving facts similar

to ours, the Eighth Circuit recently held that it does. *Contemporary Indus. Corp.*, 564 F.3d at 986 ("Nothing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of 'settlement payment' simply because the stock at issue was privately held"). The court construed the phrase "commonly used in the securities trade" as "a catchall phrase intended to underscore the *breadth* of the § 546(e) exemption." *Id.* We agree. While, like the Eighth Circuit, we recognize that other courts have reached a different conclusion, those courts stressed that Congress intended to protect *publicly* traded securities from market volatility caused by bankruptcy by means of § 546(e). *See, e.g., In re Norstan Apparel Shops, Inc.*, 367 B.R. 68, 76 (Bankr. E.D.N.Y. 2007). But unlike the instant case, the *Norstan* transaction involved the two sole shareholders of a closely held Subchapter S corporation, did not implicate public securities markets, and lacked many of the indicia of transactions "commonly used in the securities trade." *See Norstan*, 367 B.R. at 73. This case, on the other hand, considers a transaction with the characteristics of a common leveraged buyout involving the merger of nearly equal companies, and nothing in the statutory language indicates that Congress sought to limit that protection to publicly traded securities. The value of the privately held securities at issue is substantial and there is no reason to think that unwinding that settlement would have any less of an impact on financial markets than publicly traded securities. *Accord Contemporary Indus.*, 564 F.3d at 987.

Accordingly, we hold that nothing in the text of § 546(e) precludes its application to settlement payments involving privately held securities.

**C. Did the Transaction Involve a "Transfer" to a Financial Institution?**

Even if the LBO transaction qualifies as a "settlement payment," plaintiffs contend that another element of § 546(e) remains unsatisfied: the requirement that a "transfer . . . made by or to a . . . financial institution" occur. In their view, the role played by HSBC Bank in this transaction did not satisfy this requirement because it never had dominion or control over those funds. The Eleventh Circuit has taken this position, *In re Munford, Inc.*, 98 F.3d 604, 610 (11th Cir. 1996), and plaintiffs urge us to adopt its reasoning:

> True, a section 546(e) financial institution was presumptively involved in this transaction. But the bank here was nothing more than an intermediary or conduit. Funds were deposited with the bank and when the

bank received the shares from the selling shareholders, it sent funds to them in exchange. The bank never acquired a beneficial interest in either the funds or the shares.

Importantly, a trustee may only avoid a transfer to a "transferee." *See* 11 U.S.C. § 550. Since the bank never acquired a beneficial interest in the funds, it was not a "transferee" in the LBO transaction. *See In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988) ("When banks receive money for the sole purpose of depositing it into a customer's account . . . the bank never has actual control of the funds and is not a § 550 transferee."). Rather, the shareholders were the only "transferees" of the funds here. And, of course, section 546(e) offers no protection from the trustees avoiding powers to shareholders; rather, section 546(e) protects only commodity brokers, forward contract merchants, stockbrokers, financial institutions, and securities clearing agencies. Accordingly, regardless of whether the payments qualify as settlement payments, section 546(e) is not applicable since the LBO transaction did not involve a transfer to one of the listed protected entities.

*Id.* at 610 (footnote omitted).

In rejecting *Munford*, the Third Circuit found that the plain language of § 546(e) simply does not require a "financial institution" to have a "beneficial interest" in the transferred funds. *In re Resorts Int'l, Inc.*, 181 F.3d at 516. The Eighth Circuit has adopted this view, *Contemporary Indus.*, 564 F.3d at 986-87 (statute does not "expressly require that the financial institution obtain a beneficial interest in the funds"), as do we. The role played by HSBC Bank in the LBO at issue was sufficient to satisfy the requirement that the transfer was made to a financial institution.

### III.

The judgment is **affirmed**.