Judge KOELTL dissents in a separate opinion.
JOHN M. WALKER, JR., Circuit Judge:
This appeal raises an issue of first impression in the courts of appeals: whether 11 U.S.C. § 546(e), which shields “settlement payments” from avoidance actions in bankruptcy, extends to an issuer’s payments to redeem its commercial paper pri- or to maturity. Enron Creditors Recovery Corp. (“Enron”)[1] seeks to avoid and recover payments Enron made to redeem its commercial paper prior to maturity from Appellees Alfa, S.A.B. de C.V. (“Alfa”), ING VP Balanced Portfolio, Inc., and ING VP Bond Portfolio, Inc. (collectively, “ING”), whose notes were redeemed by Enron. Alfa and ING argue that § 546(e) protects these payments from avoidance.
The Bankruptcy Court for the Southern District of New York (Arthur J. Gonzalez, Bankruptcy Judge) concluded that § 546(e)’s safe harbor does not protect Enron’s payments from avoidance because they were made to retire debt, not to purchase securities, and because they were extraordinary. The District Court for the Southern District of New York (Colleen McMahon, Judge) held that Enron’s payments do fall within the safe harbor, reversed the Bankruptcy Court’s decision, and remanded with instructions to enter summary judgment in favor of Alfa and ING.
On appeal, Enron challenges the district court’s conclusion that the safe harbor protects Enron’s redemption payments whether or not they were made to retire debt or were unusual. Because we agree with the district court that Enron’s proposed exclusions from the reach of § 546(e) have no basis in the Bankruptcy Code, we AFFIRM its decision and order.
*331 BACKGROUND
After a series of events in the latter half of 2001, including the resignation of its CEO, Jeffery Skilling, its announcement of $600 million in third-quarter losses, the commencement of an SEC investigation into its practices, and the correction of four years’ worth of financial statements, Enron, a Houston-based energy company, collapsed. See, e.g., David S. Hilzenrath, Early Warnings of Trouble at Enron, Wash. Post, Dec. 30, 2001, at A10.
On December 2, 2001, Enron petitioned for Chapter 11 bankruptcy. This appeal arises out of Enron’s attempt to avoid and recover pre-petition payments it made to redeem, prior to maturity, commercial paper it had issued.
I. Facts
Between October 25, 2001 and November 6, 2001, Enron drew down on its $3 billion revolving lines of credit and paid out more than $1.1 billion to retire certain of its unsecured and uneertificated commercial paper prior to the paper’s maturity. Enron redeemed the commercial paper at the accrued par value, calculated as the price originally paid plus accrued interest. This price was considerably higher than the paper’s market value.
The offering memoranda that accompanied the issuance of the commercial paper provided that the “Notes are not redeemable or subject to voluntary prepayment by the Company prior to maturity.” This provision prohibited calls and puts: Enron could not force investors to surrender the notes and the investors could not require Enron to prepay them.
The Depository Trust Company (the “DTC”), a clearing agency, maintained bookkeeping entries that tracked ownership of Enron’s commercial paper. This is the customary tracking method in the industry. Every issuer of commercial paper has an issuing and paying agent (“IPA”) within the DTC to issue commercial paper and to pay at maturity or at an early redemption.
Three broker-dealers, J.P. Morgan, Goldman, Sachs & Co., and Lehman Brothers Commercial Paper, Inc., participated in Enron’s redemption. They received the commercial paper from the individual noteholders and paid them the redemption price. The mechanics of these transfers were as follows. The DTC debited the redemption price from each broker-dealer’s account and credited it to the noteholder’s DTC account. The broker-dealers then transferred the notes to the DTC account of Enron’s issuing and paying agent, Chase IPA, and received payment from Enron through the DTC. Immediately after the broker-dealer received payment, the commercial paper Enron redeemed was extinguished in the DTC system. Confirmations of these transactions referred to them as securities trades, termed them “purchases” from the holders, and referenced a “trade date” and “settlement date.”
Prior to these transactions, ING and Alfa owned Enron commercial paper in the amount, respectively, of $48,200,000 and $5,667,255. They both agreed to transfer their commercial paper to broker-dealer J.P. Morgan in exchange for the redemption price.
The parties dispute the circumstances and motives surrounding Enron’s redemption. Enron argues that it made the redemption payments under pressure from noteholders seeking to recover on their investments amidst rumors of Enron’s imminent implosion. Alfa and ING argue that Enron redeemed its commercial paper to “calm the irrational markets” and leave a favorable impression that would allow it to reenter the commercial paper market *332 once “bad publicity” about the company’s stability “had blown over.” They argue that the redemption was an economically rational move that allowed Enron to refinance its existing commercial paper debt with debt at a lower interest rate.
II. Procedural History
In November 2008, two years after Enron filed for bankruptcy, the reorganized entity brought adversary proceedings against approximately two hundred financial institutions, including appellees Alfa and ING, seeking to avoid and recover the redemption payments. It alleged that the payments were recoverable as (1) preferential transfers under 11 U.S.C. § 547(b), because they were made on account of an antecedent debt within ninety days prior to bankruptcy, and (2) constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B), because the redemption price exceeded the commercial paper’s fair market value.
In 2004, the defendants in the adversary proceedings moved to dismiss Enron’s complaint for failure to state a claim. They argued that the redemption payments were “settlement payments” protected from avoidance under 11 U.S.C. § 546(e)’s safe harbor.
Section 546(e) provides, in relevant part, that
[n]otwithstanding sections ... 547 [and] 548(a)(1)(B) ... of this title, [which empower the trustee to avoid preferential and constructively fraudulent transfers,] the trustee may not avoid a transfer that is a ... settlement payment, as defined in section ... 741 of this title, made by or to (or for the benefit of) a ... stockbroker, financial institution, financial participant, or securities clearing agency ... that is made before the commencement of the case, except under section 548(a)(1)(A) of this title[, which empowers the trustee to avoid transfers made with actual intent to hinder, delay, or defraud creditors].
Section 741(8) of Title 11, in turn, defines a “settlement payment” as “a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.”
The bankruptcy court denied the motion to dismiss. It held that the phrase “commonly used in the securities trade” in § 741(8) modifies all the terms in the section’s definition and thereby limits protected “settlement payments” to those that are common in the industry. In re Enron Corp., 325 B.R. 671, 685-86 & n. 7 (Bankr. S.D.N.Y.2005) (“Enron 7”). The bankruptcy court held that evidence was necessary to determine whether the redemption payments were commonly used, rather than, as Enron alleged, extraordinary because they resulted from coercion by holders of the commercial paper. Id. at 686. It also held that a factual issue existed over whether Enron’s redemption payments were made to retire debt or to purchase the commercial paper, and that this distinction could affect whether the payments constituted settlement payments. Id. Most of the defendants settled with Enron after Judge Gonzalez denied their motions to dismiss.
Following discovery, Alfa and ING, relying on § 546(e)’s safe harbor, moved for summary judgment. The bankruptcy court denied the motions. In re Enron Creditors Recovery Corp., 407 B.R. 17, 45 (Bankr.S.D.N.Y.2009) (“Enron II”). Concluding that “the transfer of ‘ownership’ of a security is an integral element in the securities settlement process,” it held that “settlement payments” include only payments made to buy or sell securities and *333 not payments made to retire debt. Id. 37-41. The bankruptcy court relied on our decision in SEC v. Sterling Precision Corp., 393 F.2d 214 (2d Cir.1968), in which we held that “a maker’s paying a note prior to maturity in accordance with its terms would not be regarded as a ‘purchase’ ” under the Investment Company Act of 1940. Enron II, 407 B.R. at 38 (quoting Sterling Precision, 393 F.2d at 217). The bankruptcy court concluded that Alfa and ING had not demonstrated that Enron’s payments were settlement payments as defined in § 741(8), because they had failed to establish that the payments were made to acquire title to the commercial paper rather than to retire debt. Id. at 37^11. At several points in its opinion, the bankruptcy court, to buttress its denial of summary judgment, emphasized facts (most of which are disputed) regarding the allegedly unusual nature of Enron’s redemption. These include the above-market price Enron paid, the alleged insistence of the broker-dealers to act as intermediaries instead of principals, and the supposed rarity of commercial paper prepayments in general. See, e.g., id. at 37-38.
Alfa and ING sought, and were granted by the district court, interlocutory review of the bankruptcy court’s decision denying summary judgment. See In re Enron Creditors Recovery Corp., No. 01-16034, 2009 WL 3349471 (S.D.N.Y. Oct.16, 2009) (“Enron III ”). The district court limited the scope of review to the question whether the § 546(e) safe harbor applies to an issuer’s redemption of commercial paper prior to maturity, effected through the customary mechanism of transacting in commercial paper through the Depository Trust Company, without regard to extrinsic facts, such as the motives and circumstances of the redemption. See In re Enron Creditors Recovery Corp., 422 B.R. 423, 424 (S.D.N.Y.2009) (“Enron IV”).
The district court reversed the bankruptcy court. It concluded that § 546(e)’s safe harbor protects Enron’s redemption payments, and directed entry of summary judgment in favor of Alfa and ING. Id. at 442. The district court held (1) that § 741(8)’s definition of “settlement payment” is not limited to payments that are “commonly used,” and, therefore, that the circumstances of a particular payment do not bear on whether that payment fits within the definition, id. at 429-34; (2) that a “settlement payment is any transfer that concludes or consummates a securities transaction,” id. at 436; and (3) that Enron’s redemption constitutes a securities transaction regardless of whether Enron acquired title to the commercial paper, because the redemption involved “the delivery and receipt of funds and securities,” id. at 435-42.
Enron appealed to this court.
DISCUSSION
On appeal, Enron argues that the bankruptcy court’s decision was correct and that the district court erred by holding that settlement payments under § 741(8) are not limited to those that are commonly used in the securities trade and that involve the transfer of title to a security.
“A district court’s order in a bankruptcy case is subject to plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court.” In re Duplan Corp., 212 F.3d 144, 151 (2d Cir.2000). Here, we review only the issue the district court agreed to hear on appeal:
whether the § 546(e) ‘safe harbor’ ... extends to transactions in which commercial paper is redeemed by the issuer prior to maturity, using the customary *334 mechanism of the Depository Trust Company ... for trading in commercial paper ..., without regard to extrinsic facts about the nature of the [transactions], the motive behind the [transactions], or the circumstances under which the payments were made.
Enron IV, 422 B.R. at 424. As several of our sister circuits have held, the meaning of “settlement payment” under § 741(8) is a matter of statutory construction and thus a question of law we review de novo. See, e.g., In re Comark, 971 F.2d 322, 324-25 (9th Cir.1992)(citing In re Kaiser Steel Corp., 952 F.2d 1230 (10th Cir.1991); Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846 (10th Cir.1990); Bevill, Bres-ler, & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass’n, 878 F.2d 742, 745 (3d Cir.1989)).
I. Judicial Interpretation of the Safe Harbor
Congress enacted § 546(e)’s safe harbor in 1982 as a means of “minimizing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.” Kaiser Steel Corp. v. Charles Schwab & Co., Inc., 913 F.2d 846, 849 (10th Cir.1990) (quoting H.R. Rep. 97-420, at 2 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 583). If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants and the securities markets themselves at risk.
The safe harbor limits this risk by prohibiting the avoidance of “settlement payments” made by, to, or on behalf of a number of participants in the financial markets. By restricting a bankruptcy trustee’s power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands “at the intersection of two important national legislative policies on a collision course-the policies of bankruptcy and securities law.” In re Resorts Int’l, Inc., 181 F.3d 505, 515 (3rd Cir.1999) (internal quotation marks omitted).
Section 741(8), which § 546(e) incorporates, defines “settlement payment” rather circularly as “a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.” The parties, following our sister circuits, agree that courts should interpret the definition, “in the context of the securities industry,” as “the transfer of cash or securities made to complete [a] securities transaction.” Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 985 (8th Cir.2009) (quoting In re Resorts Int’l, Inc., 181 F.3d at 515).
Although our circuit has not yet addressed the scope of § 741(8)’s definition, other circuits have held it to be “extremely broad.” In re QSI Holdings, Inc., 571 F.3d 545, 549 (6th Cir.2009) (quoting Contemporary Indus. Corp., 564 F.3d at 985). Several circuits, for example, have rejected limitations on the definition that would exclude transactions in privately held securities or transactions that do not involve financial intermediaries that take title to the securities during the course of the transaction. See, e.g., In re Plassein Int’l Corp., 590 F.3d 252, 258-59 (3rd Cir.2009); In re QSI Holdings, Inc., 571 F.3d at 549-50; Contemporary Indus. Corp., 564 F.3d at 986. No circuit has yet addressed the safe harbor’s application to an issuer’s early redemption of commercial paper.
Alfa and ING argue that Enron’s redemption payments are settlement payments within the meaning of § 741(8) *335 because they completed a transaction involving the exchange of money for securities. The SEC and the Securities Industry and Financial Markets Association, a trade group representing the interests of securities firms, banks, and asset managers, have filed amicus briefs in support of Alfa and ING’s interpretation of the statute.
Enron proposes three limitations on the definition of settlement payment in § 741(8), each of which, it argues, would exclude the redemption payments. First, it contends that the final phrase of § 741(8) — “commonly used in the securities trade” — excludes all payments that are not common in the securities industry, including, Enron argues, Enron’s redemption. Second, Enron argues that the definition includes only transactions in which title to the securities changes hands. Because, Enron argues, the redemption payments here were made to retire debt and not to acquire title to the commercial paper, they are not settlement payments within the meaning of § 741(8). Finally, Enron argues that the redemption payments are not settlement payments because they did not involve a financial intermediary that took title to the transacted securities and thus did not implicate the risks that prompted Congress to enact the safe harbor.
Because we find nothing in the Bankruptcy Code or the relevant caselaw that supports Enron’s proposed limitations on the definition of settlement payment in § 741(8), we reject them. We hold that Enron’s redemption payments fall within the plain language of § 741(8) and are thus protected from avoidance under § 546(e).
II. “Commonly Used in the Securities Trade”
Section 741(8) defines “settlement payment” as “a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.” Enron argues that the phrase “commonly used in the securities trade” modifies all the preceding terms and thereby excludes from the definition all uncommon payments. We disagree.
First, as the district court held, the grammatical structure of the statute strongly suggests that the phrase “commonly used in the securities trade” modifies only the term immediately preceding it: “any other similar payment.” Under the “rule of the last antecedent, ... a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows.” Barnhart v. Thomas, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003); see also Stepnowski v. Comm’r, 456 F.3d 320, 324 n. 7 (3d Cir.2006) (“Under the last-antecedent rule of construction, ... the series ‘A or B with respect to C’ contains two items: (1) A’ and (2) ‘B with respect to C.’ ”). Enron seizes on a corollary rule of construction under which “a modifier ... set off from a series of antecedents by a comma ... should be read to apply to each of those antecedents.” Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd., 186 F.3d 210, 215 (2d Cir.1999), abrogated on other grounds as recognized by Sarhank Grp. v. Oracle Corp., 404 F.3d 657, 660 n. 2 (2d Cir.2005). For example, in the phrase “no person shall be deprived of life, liberty, or the pursuit of happiness, without due process of law,” the phrase “without due process of law” modifies all three terms. This rule, however, does not apply to the series in § 741(8) because the modifier is not set off from its antecedents by a comma. Because both the modifier and its immediate antecedent are set off from the preceding *336 terms in the series, the last-antecedent rule applies. The phrase “commonly used in the securities industry” thus is properly read as modifying only the term “any other similar payment.” The phrase is not a limitation on the definition of settlement payment, but rather, as our sister circuits have held, it is “a catchall phrase intended to underscore the breadth of the § 546(e) exemption.” In re QSI Holdings, Inc., 571 F.3d at 550 (quoting Contemporary Indus. Corp., 564 F.3d at 986 (emphasis in original)).
Moreover, Enron’s proposed reading would make application of the safe harbor in every case depend on a factual determination regarding the commonness of a given transaction. It is not clear whether that determination would depend on the economic rationality of the transaction, its frequency in the marketplace, signs of an intent to favor certain creditors — as suggested by the facts on which the bankruptcy court relied, such as the alleged coercion by Enron’s commercial paper noteholders, Enron II, 407 B.R. at 31 — or some other factor. This reading of the statute would result in commercial uncertainty and unpredictability at odds with the safe harbor’s purpose and in an area of law where certainty and predictability are at a premium.
Accordingly, we hold that the phrase “commonly used in the securities industry” limits only the phrase immediately preceding it; it does not limit the other transactions that § 741(8) defines as settlement payments.
III. Redemption of Debt Securities
Enron next argues that the redemption payments are not settlement payments because they involved the retirement of debt, not the acquisition of title to the commercial paper. We find no basis in the Bankruptcy Code or the relevant case-law to interpret § 741(8) as excluding the redemption of debt securities. Because Enron’s redemption payments completed a transaction in securities, we hold that they are settlement payments within the meaning of § 741(8).
The bankruptcy court agreed with Enron’s position, relying in large part on our decision in SEC v. Sterling Precision Corp., 393 F.2d 214 (2d Cir.1968). See Enron II, 407 B.R. at 37-40. In Sterling Precision Corp., we held that an issuer’s redemption of bonds and preferred stock was not a “purchase” within the meaning of the Investment Company Act of 1940. 393 F.2d at 217. We based this conclusion, in part, on the fact that the issuer “did not acquire title to its Debentures or Preferred Stock; it discharged them.” 393 F.2d at 216-18. Drawing on this conclusion, the bankruptcy court held that Enron’s redemption payments do not constitute settlement payments under § 741(8) because Enron did not acquire title to the commercial paper it redeemed. Enron II, 407 B.R. at 38-40.
Alfa and ING argue that Sterling Precision Corp. is not relevant to this case because it interpreted the Investment Company Act, not the Bankruptcy Code. Setting aside this argument, reliance on Sterling Precision Corp. ’s interpretation of the term “purchase” still makes sense only if we read a purchase or sale requirement into § 741(8). For the following reasons, we decline to do so.
Nothing in the text of § 741(8) or in any other provision of the Bankruptcy Code supports a purchase or sale requirement. Enron argues that a “settlement payment” must involve a transaction in securities, which, in turn, must involve a purchase or sale. While we, like our sister circuits, agree that in the context of the securities industry a “ ‘settlement’ refers to ‘the completion of a securities transaction,”’ Con *337 temporary Indus. Corp., 564 F.3d at 985 (quoting Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir.1990)), we find little support for the contention that a securities transaction necessarily involves a purchase or sale. Several of the industry definitions of “settlement payment” on which other courts of appeals have relied define the term as an exchange of money or securities that completes a securities transaction; these definitions make no mention of a requirement that title to the securities changes hands. See, e.g., Kaiser Steel Corp., 913 F.2d at 849 (citing, inter alia, D. Brownstone & I. Franck, The VNR Investor’s Dictionary 279 (1981) (defining “settlement” as “finishing up of a transaction or group of transactions”); Group of Thirty, Clearance and Settlement Systems in the World’s Securities Markets 86 (1989) (defining “settlement” as “[t]he completion of a transaction, wherein securities and corresponding funds are delivered and credited to the appropriate accounts”); A. Pessin & J. Ross, Words of Wall Street: 2000 Investment Terms Defined 227 (1983) (defining “settlement” as “the completion of a securities transaction”)). While, as the dissent notes, see Dissent at 342, Kaiser Steel Corp. also cites industry definitions that reference a purchase or sale of securities, 913 F.2d at 849, the range of definitions that the decision cites suggests that the securities industry does not universally consider a purchase or sale of securities to be a necessary element of a settlement payment.
Enron argues, and the dissent agrees, see Dissent at 347, that applying the safe harbor to Enron’s commercial paper redemption would contradict “uniform case law spanning two decades” that allows “avoidance of debt-related payments.” The cases on which Enron relies, however, involve non-tradeable bank loans, not widely issued debt securities. See, e.g., Union Bank v. Wolas, 502 U.S. 151, 152-53, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); Ray v. City Bank & Trust Co., 899 F.2d 1490, 1491-93 (6th Cir.1990); Breeden v. L.I. Bridge Fund, LLC, 220 B.R. 739, 740 (2d Cir. BAP 1998); CEPA Consulting, Ltd. v. N.Y. Nat’l Bank, 187 B.R. 105, 106-07 (S.D.N.Y.1995). Concluding that the safe harbor protects payments made to redeem tradeable debt securities does not contradict caselaw permitting avoidance of payments made on ordinary loans. Interpreting the term “settlement payment” in the context of the securities industry will exclude from the safe harbor payments made on ordinary loans.
Indeed, it is not clear that a purchase or sale requirement would necessarily exclude all payments made on ordinary loans. For example, what if parties structured the early repayment of a loan evidenced by a promissory note as a repurchase of that promissory note? The note’s terms could prohibit voluntary early redemption. If the borrower were to buy back the promissory note at a negotiated price, it would be difficult to characterize this transaction as a redemption rather than a repurchase in order to exclude it from the safe harbor.
The payments at issue in this case demonstrate the difficulty with and the absence of a statutory foundation for a purchase or sale requirement. Assume, for example, that the terms of Enron’s commercial paper-like the terms of the hypothetical promissory note discussed above-prohibited early redemption. Enron could reacquire the paper only by agreeing with the paper holders on a particular reacquisition price. This transaction would appear to be a repurchase,[2] cf. Sterling Pre *338 cision Corp., 393 F.2d at 217 (“[A] maker’s paying a note prior to maturity in accordance with its terms would not be regarded as a ‘purchase.’ ” (emphasis added)), and would thus trigger safe-harbor protection under the rule Enron and the dissent espouse. It is difficult to see, however, why this transaction should warrant safe harbor protection while a transaction identical in every respect, except that the commercial paper’s terms did not prohibit early redemption, should not. Avoidance of the transactions in either scenario would present the same threat of systemic risk in the marketplace, and limiting safe-harbor protection to transactions in the first scenario would not prevent an issuer from making payments to reacquire commercial paper during the preference period. Contrary to the dissent’s contention, see Dissent at 346, a purchase or sale requirement would thus not prevent Enron from favoring commercial-paper holders over other creditors.
Because we find no basis in the Bankruptcy Code or the caselaw for a purchase or sale requirement, and because we do not think such a requirement is necessary to exclude from the safe harbor repayment of ordinary loans, we decline to impose a purchase or sale requirement on § 741(8).
IV. Involvement of a Financial Intermediary
Enron also argues that the redemption of debt does not constitute a protected settlement payment because it did not involve a financial intermediary that took a beneficial interest in the securities during the course of the transaction. Enron argues that the redemption thus did not implicate the systemic risks that motivated Congress’s enactment of the safe harbor. Although the role of the broker-dealers that participated in Enron’s redemption is a disputed issue of fact, see Enron IV, 422 B.R. at 426, Enron is correct that the DTC acted as a conduit and recordkeeper rather than a clearing agency that takes title to the securities during the course of the transaction.
Nevertheless, we do not think the absence of a financial intermediary that takes title to the transacted securities during the course of the transaction is a proper basis on which to deny safe-harbor protection. The Third, Sixth, and Eighth Circuits rejected similar arguments in affirming application of the safe harbor to leveraged buyouts of private companies that involved financial intermediaries who served only as conduits. See In re Plassein Int’l Corp., 590 F.3d at 257-59; In re QSI Holdings, Inc., 571 F.3d at 549-50; Contemporary Indus. Corp., 564 F.3d at 986. In reasoning that provides an analog for us, these courts explained that undoing long-settled leveraged buyouts would have a substantial impact on the stability of the financial markets, even though only private securities were involved and no financial intermediary took a beneficial interest in the exchanged securities during the course of the transaction.[3] See In re Plassein Int’l *339 Corp., 590 F.3d at 258; In re QSI Holdings, Inc., 571 F.3d at 550; Contemporary Indus. Corp., 564 F.3d at 987. We see no reason to think that undoing Enron’s redemption payments, which involved over a billion dollars and approximately two hundred noteholders, would not also have a substantial and similarly negative effect on the financial markets.
Moreover, § 546(e) applies to settlement payments made “by or to (or for the benefit of)” a number of participants in the financial markets. It would appear inconsistent with this language for courts to limit the safe harbor circuitously by interpreting the definition of “settlement payment” to exclude payments that do not involve a financial intermediary that takes title to the securities during the course of the transaction.
In sum, we decline to adopt Enron’s proposed exclusions from the definition of settlement payment and the safe harbor. The payments at issue were made to redeem commercial paper, which the Bankruptcy Code defines as a security. 11 U.S.C. § 101(49)(A)(i).[4] They thus constitute the “transfer of cash ... made to complete [a] securities transaction” and are settlement payments within the meaning of § 741(8). See Contemporary Indus. Corp., 564 F.3d at 985 (quoting In re Resorts Int’l, Inc., 181 F.3d at 515 (3rd Cir. 1999)). Because we reach this conclusion by looking to the statute’s plain language, we decline to address Enron’s arguments regarding legislative history, which, in any event, would not lead to a different result. See Lamie v. U.S. Trustee, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (“It is well established that when the statute’s language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd-is to enforce it according to its terms.” (internal quotation marks omitted)).
CONCLUSION
For the foregoing reasons, we AFFIRM the district court’s decision reversing the decision of the Bankruptcy Court and directing entry of summary judgment in favor of Alfa and ING.

. This opinion will refer to Enron Corp. and the reorganized entity, Enron Creditors Recovery Corp., collectively as "Enron.”

. Whether the reacquisition of commercial pwpev at issue in this appeal is properly char *338 acterized as a redemption or a repurchase remains an open issue. See Enron II, 407 B.R. at 45. Because the district court addressed on appeal only whether the safe harbor protects an issuer’s premature redemption of commercial paper, we do not have occasion to address the distinction between a premature redemption and an issuer’s repurchase of commercial paper.

. The dissent characterizes these decisions as ”stand[ing] for the proposition that, if Section 546(e) applies to a particular type of transaction-namely, purchases of equity securities-an individual transaction does not lose safe-harbor protection simply because it does not involve a central counterparty.” Dissent at 344. We have difficulty understanding the import of this characterization. We rely on these decisions as support for rejecting En *339 ron’s argument that a transaction must involve a central counterparty to receive safe-harbor protection. The dissent argues that Congress enacted the safe harbor out of "concern for the stability of central counterparties that guarantee both sides of a securities transaction.” But the dissent does not appear to dispute our, or the Third, Sixth, and Eighth Circuits', rejection of a restriction on the safe harbor that would limit it to transactions involving central counterparties.

. We reject, as the district court did, Enron’s attempt to supplant the Bankruptcy Code's definition of "security” with the definition in the Securities Exchange Act of 1934, which excludes short-term commercial paper. 15 U.S.C. § 78c(a)(10). This case calls on us to interpret a provision of the Bankruptcy Code. It makes little sense to look to a definition from a different statutory scheme, particularly when that definition contradicts the Bankruptcy Code’s.