12-4270-bk
*In re Quebecor World (USA), Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2012

(Argued:  May 13, 2013    Decided: June 10, 2013)

Docket No. 12-4270-bk

———————————

IN RE:  QUEBECOR WORLD (USA) INC.,

*Debtor.*

———————————

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF QUEBECOR WORLD (USA) INC.

*Appellant,*

v.

AMERICAN UNITED LIFE INSURANCE COMPANY, AUSA LIFE INSURANCE
COMPANY, BARCLAYS BANK PLC, DEUTSCHE BANK SECURITIES INC., LIFE
INVESTORS INSURANCE COMPANY OF AMERICA, MIDLAND NATIONAL LIFE
INSURANCE COMPANY ANNUITY, MODERN WOODMEN OF AMERICA, NORTH
AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE/ANNUITY, NORTH
AMERICAN COMPANY FOR LIFE AND HEALTH INSURANCE OF NEW YORK,
PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, THE NORTHWESTERN
MUTUAL LIFE INSURANCE COMPANY, THE PAUL REVERE LIFE INSURANCE
COMPANY, SYMETRA LIFE INSURANCE COMPANY, TRANSAMERICA FINANCIAL
LIFE INSURANCE COMPANY, TRANSAMERICA LIFE INSURANCE COMPANY,
WACHOVIA CAPITAL MARKETS, LLC, WILTON REASSURANCE LIFE COMPANY OF
NEW YORK, JOHN DOES, 1-50, DEUTSCHE BANK AG,

*Appellees.*

Before:

CHIN AND LOHIER, *Circuit Judges*,
AND SWAIN, *District Judge.*<sup>*</sup>

Appeal from a judgment of the United States District Court for the Southern District of New York (Furman, *J.*), affirming an order of the United States Bankruptcy Court (Peck, *J.*) dismissing appellant's adversary complaint.  Appellant sought to avoid and recover certain payments made to appellees in exchange for private placement notes that had been issued by one of debtor's affiliates.  Both lower courts held that the payments were exempt from avoidance under section 546(e) of the Bankruptcy Code.

AFFIRMED.

> JOHN K. SHERWOOD (Jason E. Halper *and*
> Natalie J. Kraner, *on the brief*),
> Lowenstein Sandler LLP, Roseland,
> New Jersey, *for Appellant.*

---

\* The Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York, sitting by designation.

JOSHUA DORCHAK (Dina Kaufman *and* Jonathan
B. Alter, *on the brief*), Bingham
McCutchen LLP, New York, New York,
*for Appellees.*

CHIN, *Circuit Judge*:

In this case, appellant Official Committee of Unsecured Creditors of Quebecor World (USA) Inc. (the "Committee") sought to avoid and recover certain payments made by debtor Quebecor World (USA) Inc. ("QWUSA") to the appellee noteholders in exchange for private placement notes that had been issued by one of QWUSA's affiliates.[1] The bankruptcy court granted appellees' motion for summary judgment, holding that the payments were exempt from avoidance because they were both "settlement payment[s]" and "transfer[s] made . . . in connection with a securities contract," within the meaning of section 546(e) of the Bankruptcy Code. 11 U.S.C. § 546(e). The district court affirmed both holdings. We need not decide whether the payments fall within the "settlement payments" safe harbor because we conclude that they clearly fall within the safe

---

[1] The parties dispute whether the payments at issue in this case were made to purchase, redeem, or extinguish these notes. For the reasons set forth below, we conclude that, in the circumstances of this case, QWUSA purchased the notes.

harbor for "transfers made . . . in connection with a securities contract."  Accordingly, we affirm the district court's judgment.

***BACKGROUND***

The relevant facts are undisputed and may be summarized as follows:

QWUSA and Quebecor World Capital Corp. ("QWCC") are subsidiaries of Quebecor World, Inc. ("QWI"), a Canadian printing company.  In 2000, QWCC raised $371 million for the Quebecor entities by issuing private placement notes (the "Notes") to the appellees pursuant to two nearly identical Note Purchase Agreements (the "NPAs").  QWI and QWUSA guaranteed the Notes and the funds were eventually transferred, at least in part, to QWUSA.

Section 8.2 of the NPAs gave QWCC the option to prepay the Notes so long as QWCC paid the outstanding principal, accrued interest, and a specified "Make-Whole Amount."  Section 8.6 prohibited any Quebecor affiliate from purchasing the Notes unless they, *inter alia*, complied with the prepayment provisions in section 8.2.  Once the

Notes were paid in full, section 8.5 required that they be surrendered to QWCC for cancellation.

The NPAs also provided for the acceleration of the Notes' maturity if QWI's debt-to-capitalization ratio fell below a certain threshold. Pursuant to the terms of QWI's separate $1 billion revolving credit facility, any default with respect to the Notes would have in turn triggered a default under the credit facility agreement, with calamitous results for Quebecor. When QWI began having financial difficulty in May 2007, it offered to purchase just over half of the Notes in exchange for increasing the debt-to-capitalization ratio, but the appellees rejected this offer. Instead, they entered a Noteholder Cooperation Agreement and Right of First Refusal Agreement (the "Cooperation Agreement"), in which they agreed not to sell their Notes to anyone but an existing noteholder.

In September 2007, QWI approved the prepayment of all the Notes and QWCC issued a notice of its intent to redeem the Notes early. After realizing redemption would have severe tax implications under Canadian law, however, QWI restructured the prepayment so that first QWUSA would

purchase the notes from the appellees for cash and then QWCC would redeem the notes from QWUSA in exchange for forgiveness of debt QWUSA owed to QWCC. QWUSA issued a new notice to appellees indicating that it -- not QWCC -- would pay the "Redemption Price" set out in the NPAs, and that the payment would "result in the purchase of the Notes by Quebecor World (USA) Inc."

On October 29, 2007, QWUSA transferred approximately $376 million to the appellees' trustee, CIBC Mellon Trust Co. ("CIBC Mellon"). CIBC Mellon distributed the funds to appellees and the appellees eventually surrendered the Notes directly to QWI in Canada. QWUSA filed for bankruptcy in the Southern District of New York on January 21, 2008, less than ninety days after making the payment for the Notes.

The Committee then commenced this adversary action, seeking to avoid and recover the October 29 transfer pursuant to section 547 of the Code. Appellees moved for summary judgment, arguing that the transfer was exempt from avoidance under section 546(e). Before that motion was resolved, this Court decided *Enron Creditors*

- 6 -

*Recovery Corp. v. Alfa, S.A.B. de C.V.* (*In re Enron Creditors Recovery Corp.*), 651 F.3d 329 (2d Cir. 2011), in which we held that payments made to redeem commercial paper before its maturity date were "settlement payments," within the meaning of section 546(e), because they were "transfer[s] of cash made to complete a securities transaction." *Id.* at 339 (quotation and alteration omitted).

After additional briefing, the bankruptcy court granted appellees' motion, holding primarily that QWUSA's payment fit the definition of "settlement payment" announced in *Enron*. Furthermore, because *Enron* had applied section 546(e) to redemptions of commercial paper, the bankruptcy court held that the payment also qualified as a "transfer made . . . in connection with a securities contract" regardless of whether QWUSA "redeemed" or "purchased" the Notes. The district court affirmed, agreeing that QWUSA's payment was a "settlement payment" under *Enron*. The court did not agree that a transfer to "redeem" securities could qualify as a "transfer made . . . in connection with a securities contract" because the Code

defines a "securities contract" as one "for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). Nevertheless, the district court affirmed the bankruptcy court's alternative holding on the basis that the transaction was in fact a "purchase," not a "redemption."

The Committee appeals.

## DISCUSSION

### A. Applicable Law

"We exercise plenary review over a district court's rulings in its capacity as an appellate court in bankruptcy," independently reviewing the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*. *Super Nova 330 LLC v. Gazes*, 693 F.3d 138, 141 (2d Cir. 2012) (quotation omitted).

Under section 547 of the Code, the bankruptcy trustee may avoid any transfer of a debtor's property interest that is:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;

- 8 -

> (4) made . . . [*inter alia*] on or
> within 90 days before the date of
> the filing of the petition . . . .

11 U.S.C. § 547(b).  Section 546(e) exempts some transfers,

however, if they fall within certain safe harbors:

> Notwithstanding section[] . . . 547
> . . . of this title, the trustee may
> not avoid a transfer [1] that is a
> margin payment . . . or settlement
> payment . . . made by or to (or for
> the benefit of) a . . . financial
> institution, . . . or [2] that is a
> transfer made by or to (or for the
> benefit of) a . . . financial
> institution . . . in connection with
> a securities contract, as defined in
> section 741(7), commodity contract,
> . . . or forward contract . . . that
> is made before the commencement of
> the case . . . .

*Id.* § 546(e).  In *Enron*, we defined a "settlement payment"

as a "transfer of cash made to complete a securities

transaction."  *In re Enron*, 651 F.3d at 339 (quotation and

alterations omitted).  Section 741(7) of the Code defines a

"securities contract" as "a contract for the purchase,

sale, or loan of a security . . . including any repurchase

or reverse repurchase transaction on any such security."

11 U.S.C. § 741(7)(A)(i).

There is a split of authority regarding what role a financial institution must play in the transaction for it to qualify for the section 546(e) safe harbor. Three circuit courts have concluded that the plain language includes any transfer to a financial institution, even if it is only serving as a conduit or intermediary. *See QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.)*, 571 F.3d 545, 550-51 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 987 (8th Cir. 2009); *Lowenschuss v. Resorts Int'l, Inc. (In re Resorts Int'l, Inc.)*, 181 F.3d 505, 516 (3d Cir. 1999). Only the Eleventh Circuit has held that the financial institution must acquire a beneficial interest in the transferred funds or securities for the safe harbor to apply. *See Munford v. Valuation Research Corp. (In re Munford, Inc.)*, 98 F.3d 604, 610 (11th Cir. 1996) (per curiam). In *Enron*, we cited the Third, Sixth, and Eighth Circuits' decisions with approval and concluded that "the absence of a financial intermediary that takes title to the transacted securities during the course of the transaction is [not] a proper basis on which

- 10 -

to deny safe-harbor protection."  *In re Enron*, 651 F.3d at 338.

**B.**   *Application*

We need not reach the "settlement payments" issue because, based on the undisputed facts, QWUSA's payment on October 29 fits squarely within the plain wording of the securities contract exemption, as it was a "transfer made by or to (or for the benefit of) a . . . financial institution . . . in connection with a securities contract."[2]  11 U.S.C. § 546(e).

QWUSA transferred funds to appellee's trustee CIBC Mellon, in the amount and manner prescribed by the NPAs for purchasing the Notes.  The parties agree that CIBC Mellon is a financial institution.  The NPAs were clearly "securities contracts" because they provided for both the original purchase and the "repurchase" of the Notes.  *Id.*

---

[2]   We note that the Court in *Enron* had no occasion to consider the "securities contract" safe harbor, which was added after Enron filed for bankruptcy and after the adversary proceeding commenced.  *See* Financial Netting Improvements Act of 2006 § 5(b)(1)(B), Pub. L. No. 109-390, 120 Stat. 2692; *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.* (*In re Enron Creditors Recovery Corp.*), 651 F.3d 329, 331-32 (2d Cir. 2011) (noting that Enron filed for bankruptcy in 2001 and adversary proceeding commenced in 2003).

§ 741(7). Accordingly, this was a transfer made to a financial institution in connection with a securities contract that is exempt from avoidance.

We need not decide whether the transfer would still be exempt if QWUSA had "redeemed" its own securities because we agree with the district court that QWUSA made the transfer to "purchase" the Notes. Generally, "[t]o redeem is defined as to purchase back; to regain possession by payment of a stipulated price; to repurchase; to regain, as mortgage property, by paying what is due; to receive back by paying the obligation." *In re United Educ. Co.*, 153 F. 169, 171 (2d Cir. 1907) (quotation omitted). Here, QWUSA was not "regaining" its own Notes; it was acquiring for the first time the securities of another corporation, QWCC. In fact, under the terms of the NPAs, only QWCC had the right to "pre-pay" or redeem the Notes; its affiliates could only "purchase" the Notes if they complied with the pre-payment provisions. Therefore, QWUSA was not "redeeming" its affiliate's Notes, but "purchasing" them.

The Committee contends that QWUSA could not have "purchased" the Notes for two reasons. First, it points to

- 12 -

evidence in the record showing that some of the appellees believed the transaction was a redemption, not a purchase. But it made no difference to appellees at the time of the transfer whether QWUSA was "redeeming" or "purchasing" the Notes because, from their perspective, the NPAs treated both the same way and appellees received the same "pre-payment" price. Thus, their subjective understanding of the transaction at the time is not dispositive.

Second, the Committee argues that the Cooperation Agreement prohibited appellees from selling the Notes, and therefore QWUSA could not have "purchased" the Notes. But the Cooperation Agreement explicitly allowed for the sale of the Notes to a "Constituent Company Guarantor" like QWUSA pursuant to an amended offer to purchase the Notes. Moreover, neither QWUSA nor any other Quebecor entity was a party to the Cooperation Agreement. Thus, nothing prohibited the noteholders as a group from selling -- and QWUSA from purchasing -- all of the Notes in a single transaction. Even if appellees had breached the Cooperation Agreement by selling to QWUSA, that would only mean that appellees are liable to each other; the breach

- 13 -

would have no effect on the validity of the transaction with QWUSA.

Finally, the Committee argues that even if QWUSA "purchased" the Notes, not all of the transfers are exempt because CIBC Mellon was merely a conduit and some of the appellees are not financial institutions. *Enron* rejected a similar argument, holding that the financial intermediary need not have a beneficial interest in the transfer. *See In re Enron*, 651 F.3d at 338-39. To the extent *Enron* left any ambiguity in this regard, we expressly follow the Third, Sixth, and Eighth Circuits in holding that a transfer may qualify for the section 546(e) safe harbor even if the financial intermediary is merely a conduit. *See In re QSI Holdings, Inc.*, 571 F.3d at 551; *Frost*, 564 F.3d at 987; *In re Resorts Int'l, Inc.*, 181 F.3d at 516.

The plain language of the statute refers to transfers made "by or to (*or* for the benefit of)" a financial institution. 11 U.S.C. § 546(e) (emphasis added).[3] Because we generally prefer a construction that

_____

[3] The phrase "(or for the benefit of)" was added by the 2006 amendments to section 546(e). *See* Financial Netting Improvements Act of 2006 § 5(b)(1), Pub. L. No. 109-390, 120

- 14 -

does not render parts of a statute superfluous, *see Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1177-78 (2013), we conclude that a transfer may be either "for the benefit of" a financial institution or "to" a financial institution, but need not be both.

Finally, we note that this construction furthers the purpose behind the exemption.  As we explained in *Enron*, in the context of the "settlement payment" prong of section 546(e):

> Congress enacted § 546(e)'s safe harbor in 1982 as a means of 'minimiz[ing] the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries.'  If a firm is required to repay amounts received in settled securities transactions, it could have insufficient capital or liquidity to meet its current securities trading obligations, placing other market participants

---

Stat. 2692.  Because this change was made after the circuit split arose, it is arguable that Congress intended to resolve the split with the 2006 Amendments. *See, e.g.*, *United States v. Mele*, 117 F.3d 73, 75 (2d Cir. 1997).  But the legislative history does not mention, let alone explain the reasoning behind, this change. *See* H.R. Rep. No. 109-648 (Part I) at 8 (2006), *reprinted in* 2006 U.S.C.C.A.N. 1585, 1593.  We need not, however, rely on this legislative history, as the words of the statute are unambiguous.

- 15 -

and the securities markets
themselves at risk.

*In re Enron*, 651 F.3d at 334 (quoting *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990)).

A transaction involving one of these financial intermediaries, even as a conduit, necessarily touches upon these at-risk markets.  Moreover, the enumerated intermediaries are typically facilitators of, rather than participants with a beneficial interest in, the underlying transfers.  A clear safe harbor for transactions made through these financial intermediaries promotes stability in their respective markets and ensures that otherwise avoidable transfers are made out in the open, reducing the risk that they were made to defraud creditors.[4] Accordingly, it was sufficient that QWUSA's transfer was made to CIBC Mellon as appellees' trustee, even though CIBC Mellon did not take title to the transferred funds.

---

[4] Of course, the "securities contract" safe harbor is not without limitation, and, for example, mere structuring of a transfer as a "securities transaction" may not be sufficient to preclude avoidance.  *See, e.g.*, 11 U.S.C. § 546(e) (providing safe harbor relief from avoidance under section 548(a)(1)(B) but not from avoidance under section 548(a)(1)(A)).

### *CONCLUSION*

For the foregoing reasons, we conclude QWUSA's payment was a "transfer made . . . in connection with a securities contract" and is exempt from avoidance pursuant to section 546(e) of the Bankruptcy Code.  Accordingly, we AFFIRM the judgment of the district court.